In re the Marriage of Alyda G. YOUNG, petitioner, Appellant,

v.

Douglas A. YOUNG, Respondent.

No. C4–84–1743.

Court of Appeals of Minnesota.

June 25, 1985.

Review Denied Sept. 13, 1985.

Mark A. Carter, Legal Advice Clinics, Ltd., Hopkins, for appellant.

Louis M. Reidenberg, Michael Ormond, Reidenberg & Jaycox, Minneapolis, for respondent.

Marilyn J. Michales, Linda Ojala, Doyle and Michales, Minneapolis, Guardian Ad Litem.

Heard, considered and decided by PARKER, P.J., and LANSING and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

This is an appeal by appellant mother Alyda G. Young from an amended judgment and decree which transferred physical and legal custody of the parties' two youngest children to respondent husband Douglas A. Young, suspended mother's visitation with those two children, retained as the court's expert an individual who had originally been retained by father as an expert witness, delegated the authority to determine mother's visitation with the two minor children to that expert, and granted only legal custody of a daughter to mother, allowing the daughter to determine when she wished to return to her mother's physical custody. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## FACTS

The parties' marriage dissolution was commenced in December 1980 and resulted in a decree of dissolution in November 1982. Four children were born of the marriage: Joseph, born March 22, 1967; Dorothy, born April 23, 1968; James, born June 4, 1974; and John, born August 8, 1976.

During the dissolution proceedings, there were a number of allegations that father had physically abused mother and Joseph, that he had sexually abused Dorothy, and that both parents and all four children needed therapy for various abuse-related and emotional problems. A guardian ad litem was appointed for the minor children. The parties entered into a stipulation several months before entry of the dissolution decree. The purpose of the stipulation was to develop "a long-range plan which will enable the minor children to have a relationship with each of their parents and with their siblings which is healthy and free from abusive conduct and which will provide treatment and therapy for all parties necessary to accomplish that goal." The terms of this stipulation were incorporated in substance into the dissolution decree.

The decree granted mother "the legal and physical custody" of John and James, subject to a number of provisions and conditions. Father was granted legal and physical custody of Joseph, also subject to provisions and conditions. Dorothy was to be placed in foster care. The decree did not specify her legal and physical custody.

The decree required that mother sign a voluntary agreement placing John and James in foster care for the school year 1982–83 and requiring that they participate in treatment and therapy. Under the terms of the decree, Dr. Sandra Hewitt, a child psychologist originally called as a witness for father in the July 1982 hearing, was to take responsibility for coordinating the various aspects of treatment. The parties stipulated to her authority to recommend a treatment plan and implement it. In addition, visitation of mother and father with John and James was to occur pursuant to Dr. Hewitt's recommendation. The decree further provided that:

Return of John and James Young to the physical custody of the Petitioner, Alyda Young, and continuing visitation by both parties with all minor children shall be upon the successful completion or progress as determined by Dr. Sandra Hewitt of the following conditions:

i. John and James Young's participation in individual and joint therapy:

ii. Alyda Young's participation in:

a. An out-patient day treatment program to address the specific goals:

(1) To remain verbally on task;

(2) To listen;

(3) To deal with positive and negative feedback.

b. Participation in therapy with her sons, John and James, as directed by Dr. Sandra Hewitt and participation in therapy with Dorothy and Joseph as required by their treating facility or therapist.

iii. Participation by Douglas Young in weekly therapy sessions with his son, Joseph, participation in a group for sex offenders under the direction of William Seals at the Center for Behavior Therapy and participation in therapy with his sons, John and James.

The decree also provided that the parties should appear in approximately six months "for a review of the parties' and the minor children's participation in treatment and therapy." That review hearing commenced on May 31, 1983, was continued several times, and was completed in March of 1984.

Numerous experts testified. The testimony was addressed almost exclusively to the emotional problems of mother and the minor children, John and James, who had been in therapy since early 1983. John's therapist, Dr. David Morris, a clinical child psychologist, testified that John was immature, had difficulty "following through," had poor social skills, and had a "real icky feeling about himself." Morris detected an "anxious" attachment and an "unhealthy symbiotic relationship" between John and mother, but testified that this did not mean that the relationship should necessarily be interrupted. James' therapist, Dr. Glenn Hirsch, also a clinical child psychologist, testified that James had trouble trusting people, accepting authority, and had a short attention span. He found James to be a moderately emotionally disturbed child who exhibited violent behavior.

Hirsch and Morris worked with mother on a "parent training package" designed by Hirsch to teach mother to have positive interaction with her children and set firm limits on them. Both therapists found her initially uncooperative and difficult to work with. Mother and her therapist, Marcia Hamilton, testified that mother had learning disabilities that accounted for her trouble with the package. After several sessions, Hirsch met with mother and Hamilton and explained the package and its rules to mother. A structure was set up within which mother could discuss problems she was having. Morris testified that after the session, mother "whizzed right through" the program. He anticipated she could complete the program in a minimum of five months. Hirsch testified that after the structure was set up, there was a "clearcut improvement in her behavior." Mother repeatedly stated that she was prepared to work with the therapists and attributed her previous problems to difficulties in communicating and a misunderstanding of the therapists' goals. Hirsch testified that he had serious concerns about whether mother would be cooperative with therapists treating James while father seemed more cooperative and had a greater capacity to work on his weaker areas.

Morris recommended placement of John with father "55/45." He based his recommendation on mother's lack of cooperation and inability to see John's problems because of her own, and on his opinion that mother could not discipline John when he was emotionally upset. Morris testified that mother was concerned with John's welfare and that John had a strong need for nurturance, which mother could provide. He admitted he had "no idea" whether father could provide the nurturing that he determined John needs. He stated that he did not know a lot about father, and that his opinion was based largely on a negative opinion of mother's abilities. Morris had between 20 and 25 sessions with John and also met with him a few times together with James and mother. Morris had only one session with father and never saw him interact with John.

Hirsch agreed that mother had stronger skills in nurturing than father. He believed, however, that father would be more effective at setting firm limits with the children. In addition, Hirsch testified that he had "unanswered questions about certain conditions" in father's home, and "[could] not make a blanket statement that he provides a stable home." Hirsch could give no clear cut recommendation on which parent should have custody.

Hewitt testified that she did the original evaluations of John and James and found both to have emotional problems and learning disabilities, and that this determination was confirmed after consultation with a number of experts who had dealt with the children. She recommended that custody be with father. She was not involved in actually treating either parent or any of the children, and based her recommendation on the testimony and reports of other witnesses.

Hewitt testified extensively regarding mother's problems, finding that she had a learning disability, problems with "staying on task" and accepting criticism, and problems with "externalizing." Hewitt testified that this would affect mother's ability as a parent because she would have problems setting up structure for the children and would fail to see her own problems and how they affect the children.

There were no allegations that mother physically or sexually abused the children. Hewitt testified, however, that she felt that mother "emotionally abused" the children. Two of mother's statements to the children labelled as "emotional abuse" by Hewitt were a statement to the effect that if the boys were good and cooperated with their therapists, they could return home, and a 1982 comment when mother said, "I might pull out of this [as a reaction to stress]." Hewitt felt these statements set the children up for guilt, shame, and frustration when they were not returned to their mother, created "anxious attachment," and indicated that mother did not realize her impact on her sons' emotional problems.

Hewitt's opinion was based primarily upon telephone calls with the children's therapists and upon witnessing testimony in court.

Hamilton, who had seen mother "almost on a weekly basis," testified regarding mother's progress on the three "specific goals" set for her in the original judgment. Hamilton stated that mother's ability to listen, to stay on task, and to deal with positive and negative feedback were as good as the ability of any normal person, and she concluded that mother had no severe emotional problems. Hamilton testified that she referred mother to the Department of Vocational Rehabilitation for tutoring for her learning disability, that mother had attended a 16-week program to teach discipline methods, a divorce group, and an incest group to deal with her emotional problems. In addition, Hamilton attended a joint therapy session with the boys' therapists and mother and concluded that mother listened to the therapists, followed through with their suggestions, and cooperated with the treatment.

Little expert testimony was addressed to father. William Seals, a therapist for sexual abuse offenders who had worked with father, testified that he believed Dorothy's claims that father had been sexually inappropriate with her, although father denied any sexually-inappropriate behavior. Seals stated that this denial was unusual for someone participating in a therapy group and that after six and a half months of therapy, father was either not capable of coming to grips with his alleged crime or did not commit it. Seals stated that he "could not put a cure label on [father]."

Although father did not admit past sexual abuse, he did admit to what Hirsch labelled "severe physical discipline." Hirsch testified that James' behavior was consistent with that of a child who was a victim of or witness to physical abuse.

At the time of the hearing, mother was pregnant, apparently as the result of a rape. She testified that she did not believe any new stress would be added to the situation by the baby. Morris testified that the baby could have a serious impact and would prevent John from feeling "special." Hirsch stated that, in general, a newborn child greatly increases the stress level in any family.

After the review hearing, the trial court made the following findings:

Both James and John have significant emotional problems which suggest that their present and future emotional health is at risk. A lack of progress by James and John in their therapy to date appears to relate in significant part to the obstacles placed by [mother] in the way of Drs. Hirsch and Morris in their work with the boys. Both boys require continued therapy and a stable, structured and nurturing home environment where they will receive continuity and discipline. Continued foster placement of the boys is not in the boys' best interests and would not continue to serve any useful purpose except during a period of transition from foster placement. * * * In order to maximize their potential for progress in therapy, it is necessary for each parent to be supportive and to be willing to work with Drs. Hirsch and Morris.

*      *      *      *      *      *

[Father] has completed therapy to the satisfaction of his therapist, William Seals.

*      *      *      *      *      *

[Mother] has participated in therapy both individually and in a group, and has made some progress towards addressing her own personal goals. However, [mother] has remaining emotional difficulties which will interfere with [her] ability to provide the parties' minor children, James and John with the structure, stability and consistency which they require in their environment which will be necessary to facilitate their progress in therapy. [Mother] is in need of continuing individual and group therapy. [She] is now pregnant and is expected to give birth to a child during the month of April, 1984. Visitation at this time, be-

tween [mother] and the parties' minor children, James and John, is likely to endanger the children's physical and emotional health and impair their emotional development because of the peculiar therapeutic needs of the boys and the needs of the [mother] and there remains a need for [mother] to recognize and address in therapy those aspects of her conduct which contribute to, and exacerbate, the boys' emotional difficulties; to date, [mother] appears to have been unable to acknowledge that conduct.

\*　　\*　　\*　　\*　　\*　　\*

It is the preference of the parties' minor child, Dorothy, that she remain in foster placement. \* \* \* [Mother] is a fit and proper person to have legal custody of the parties' minor child, Dorothy.

[Father] appears to have the capacity to provide the parties' minor children, James and John, with a stable, structured and consistent environment as well as the discipline recommended by Drs. Hirsch and Morris. [Father] is a fit and proper person to have care, custody and control of the parties' minor children, James and John but because of the peculiar needs of the boys, it is necessary for [father] to continue to participate in his sons' therapy program.

Mother has had visitation once with James and John during the last year while the temporary suspension has been in effect.

### ISSUES

1. Did the trial court err in applying Minn.Stat. § 518.17 (1982) to grant custody of James and John to father?

2. Does the evidence support the trial court's grant of custody of the minor children, James and John, to father pursuant to Minn.Stat. § 518.18(d)(iii) (1982)?

3. Did the trial court abuse its discretion in suspending mother's visitation rights?

4. Did the trial court err in retaining an expert initially obtained by father as a witness when the parties had previously stipulated that the expert had authority to recommend and implement a treatment plan for the family?

5. Did the trial court improperly delegate its judicial authority to the court-appointed expert when the expert's recommendation was subject to the court's supervision and independent decision-making authority?

6. Did the trial court err in allowing a 17-year old daughter to determine when she would return to her mother's physical custody?

### ANALYSIS

#### I.

The dissolution decree granted legal and physical custody of James and John to mother. However, the trial court stated that in transferring custody after the review hearing, it was applying the factors set out in Minn.Stat. § 518.17, subd. 1 (1982) [1] (the standard for an initial determination of custody), as well as the Juvenile Court Act and the Minnesota Rules for Juvenile Court Proceedings. On appeal, mother argues that custody can be changed only in compliance with those factors set forth in Minn.Stat. § 518.18 (1982).

The memorandum accompanying the trial court's review hearing order stated that the court had intended the original decree to provide "a temporary but relatively stable structure within which the parties and their children could receive \* \* \* needed therapy." Consistent with that statement by the trial court, father cites Minn.Stat. § 518.131 (1982), under which the trial court has authority to determine temporary custody and visitation rights pending the final disposition of the proceedings. Thus, father argues permanent custody was never determined because the parties' stipulation, incorporated "in substance" into the decree, only concerned temporary custody. We cannot agree.

---

1. *The review hearing began in 1983.*

■ Although the trial court had the authority to make a temporary determination of custody in the dissolution decree, it did not do so. Any temporary order ceases to be effective when the dissolution decree is entered. Minn.Stat. § 518.131, subd. 5 (1982). Here, the decree granted in clear language "the legal and physical custody of * * * James and John * * * to [mother]." Although custody was subject to "the provisions and conditions set forth hereinafter," those provisions and conditions merely structured therapy for the parties and provided that *physical custody* would be *returned* to mother conditioned on "the successful completion or progress" of mother and the two boys in therapy and mother's progress regarding · personal goals. The express purpose of the review hearing scheduled in the decree was to "review the parties' * * * participation in treatment and therapy." It does not follow that the review hearing encompassed a de novo determination of custody under the provisions of Minn.Stat. § 518.17, subd. 1.

■ The express language of the decree clearly granted custody to mother. We do not believe that determination is contradicted by the parties' stipulation made several months earlier and incorporated "in substance" into the decree. We conclude that the trial court erred in transferring the custody of James and John from mother to father based on the factors set out in Minn. Stat. § 518.17, subd. 1. Minn.Stat. § 518.-18 governs modification of a final custody order. *See State ex rel. Gunderson v. Preuss,* 336 N.W.2d 546, 547–48 (Minn. 1983). The fact that James and John have been in foster care since the time of the dissolution is a factor which properly may have been considered by the trial court, but does not alter our determination that any change of custody in this matter must be governed by the provisions of section 518.-18.

## II.

■ Although the trial court applied Minn.Stat. § 518.17, subd. 1, at the review hearing, it also stated that it considered that the threshold test of a change in circumstances in Minn.Stat. § 518.18 had been met. In *Gunderson,* the Minnesota Supreme Court determined that a change of custody could not be sustained in the absence of findings of fact required by section 518.18: (1) that a change has occurred in the circumstances of the child or custodian, and (2) that the modification of custody is necessary to serve the best interests of the child. *Gunderson,* 336 N.W.2d at 548. Section 518.18 further directs that:

> [t]he court shall retain the custodian established by the prior order unless:
>
> \* \* \* \* \* \*
>
> (iii) The child's present environment endangers his physical or emotional health or impairs his emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

Minn.Stat. § 518.18(d) (1982).

This matter involved several years of litigation, numerous experts, and resulted in a voluminous transcript. After the review hearing, the trial court found a change of circumstances due to mother's and the boys' lack of progress in therapy. Certainly, substantial testimony supports a conclusion that the boys and mother have various emotional problems. However, there is no indication that the problems have worsened since the original decree. Testimony of the boys' therapists and mother's therapist indicates rather that the boys and mother have improved.

The trial court finds that mother impedes the boys' progress in therapy by placing "obstacles" in the way of their therapists. However, the boys were in foster care during the entire period of therapy, and mother had only supervised visitation on alternate weekends. The primary evidence of "obstacles" seems to be mother's initial difficulty in understanding the therapists' goals, her learning disability, and her frustration with the artificial clinic setting and hostility toward the therapists as part of the system that was depriving her of a relationship with her children. Her con-

cern for the children is evident throughout the record. In addition, undisputed testimony indicates that mother was improving in her attempts to cooperate with the therapists and in her understanding of their goals. In addition, testimony indicates mother was making progress on her own emotional and abuse-related problems and on the "specific goals" set for her in the original decree.

We are unable to find support in the record for the proposition that mother's expected child is a sufficient change in circumstances to warrant transfer of custody. Although Morris testified that the impact of the new child would be "serious" and that John would no longer feel "special," no concrete evidence was presented as to why the effect here would be significantly different than the impact a new infant makes in any home. In addition, the woman with whom father now lives testified that her young son has been diagnosed as hyperactive and has been hospitalized for emotional problems. The trial court made no findings regarding the potential impact of this situation on James and John should they be placed in father's custody.

Further, we note that little evidence was presented regarding father's emotional health, his capabilities as a parent, and the environment he could provide as a custodial parent to James and John. John's therapist, for example, recommended that father be granted custody even though the therapist had only one session with father. He had never seen father interact with either John or James. The court did not address father's admitted past physical abuse nor the allegations of sexual abuse. The court's finding that father "has completed therapy to the satisfaction of his therapist" is directly contradicted by that therapist's statement that he "could not put a cure label" on father. The finding that father "appears to have the capacity to provide * * * a stable, structured and consistent environment" was made virtually without factual evidence in the record, and there is a lack of evidence that father was capable

of providing the nurturance the boys needed. The only finding regarding father which is supported by evidence is that he could provide the discipline recommended by the therapists. Father's effectiveness at disciplining was observed only in a clinical setting with no home study. Considering unanswered concerns raised regarding father's past physical abuse, we question whether much weight can be given to testimony regarding discipline as it affects this custody determination.

The record before us is one-sided and narrow in scope. Testimony is concentrated on the parenting problems of mother. Testimony regarding either the parenting capabilities or deficiencies of father is almost nonexistent. Further, no determination was made by the trial court that

> [t]he child's present environment endangers his physical or emotional health or impairs his emotional development and the harm likely to be caused by a change of environment is outweighed by the advantage of a change to the child.

Minn.Stat. § 518.18(d)(iii) (1982).

The stringent requirements of section 518.18(d)(iii) were not met, and a change of custody cannot be premised upon that statute.

### III.

■ The court ruled that mother's right of visitation with John and James was to be "immediately and temporarily suspended." This ruling is the most troublesome of all made by the trial court.[2] With the exception of total termination of parental rights or permanent suspension of visitation, it is the harshest sanction which can be imposed upon a parent and upon a child.

Of course, a court is authorized under Minn.Stat. § 518.175 (1982) to restrict visitation and may even deny it entirely upon a finding that visitation is "likely to endanger the child's physical or emotional health or impair his emotional development." Minn.Stat. § 518.175, subd. 1 (1982). The trial court, in fact, did make such a finding

---

**2.** At oral argument, we were informed that the "temporary" suspension has lasted for a year.

concerning visitation. However, we cannot discern adequate support in the record for such finding and conclude it was erroneous.

Although John's therapist testified that John had an "anxious" attachment to mother, he also testified that he did not believe the relationship should be interrupted. James' therapist testified that mother had trouble managing James when he "gets out of hand." However, other evidence indicated that mother was improving her ability to discipline effectively. In addition, undisputed testimony from all witnesses indicated that mother loved the children and was concerned for their welfare. John's therapist testified that John had a strong need for nurturance and that mother was the more nurturing parent, while father was weak in this area. James' therapist testified that James has a stronger emotional attachment to his mother than to his father.

We do not find the evidence of "emotional abuse" credible. Neither do we find the alleged "obstacles" placed by mother in the way of therapy persuasive. James' therapist admitted that mother's lack of cooperation could indicate many different things, including disagreement with the particular treatment approach, and a desire to seek another therapist and try a different approach. In addition, the evidence indicates the mother was trying to cooperate, and her lack of cooperation and inability to understand the therapy goals and techniques had no connection with a lack of love or concern for the children, nor her appropriateness as a visiting parent.

The Minnesota Supreme Court has recognized the importance of visitation to both parent and child. In *Griffin v. Van Griffin,* 267 N.W.2d 733 (Minn.1978), the court observed:

> We believe our prior cases concerned with visitation by a noncustodial parent reflect the policy embodied in Minn.St. 518.175 that visitation is to be regarded as a parental right essential to the continuance and maintenance of a child-to-parent relationship between the child and noncustodial parent, and that a denial of

this right shall be based on persuasive evidence that visitation will not serve the best interests of the child. (Cites omitted.)

*Id.* at 735.

On the basis of the record before us, we cannot affirm the trial court's decision to suspend all visitation between mother and James and John. We are left with a firm conviction that the harsh sanction of suspension of all visitation with the resultant rupture of the parent/child relationship is totally inappropriate under the circumstances of this case. The trial court, upon remand, is directed to immediately establish a visitation schedule which will serve the best interests of James and John while assuring a reestablishment, strengthening and nurture of the bonds between this parent and these children.

### IV.

■ Mother argues that the trial court abused its discretion when it requested that Dr. Hewitt act as a court-appointed expert. Mother's objection stems from the fact that Hewitt was retained by father in preparation for the original dissolution hearing. However, the parties, who were both represented by counsel, stipulated prior to the dissolution to Hewitt's authority to recommend and implement a treatment plan. That stipulation was incorporated into the dissolution decree, and no appeal was taken therefrom. Therefore, the issue is not properly before the court at this time. Mother also objects to Dr. Hewitt's direction of James' and John's therapy. This issue also was included in the stipulation incorporated into the decree.

### V.

■ Mother next alleges that the trial court in the amended judgment and decree improperly delegated to Dr. Hewitt authority to recommend when mother should be allowed to resume visitation with James and John. We have earlier addressed the issue of resumption of visitation. We find no improper delegation of judicial authority when an expert is permitted to make rec-

ommendations. However, we stress that, despite involvement of an expert upon whom substantial reliance is placed, the court has a duty to exercise its own independent judgment regarding the decisions which must be made from time to time.

## VI.

 Finally, mother argues that the trial court abused its discretion in permitting Dorothy to determine when she would return to mother's physical custody. While it would not be proper for a trial court to abandon its judicial decision-making function even when the custody at issue is that of a 17-year old, we find no error in the trial court's determination regarding Dorothy. She will be an adult in less than eleven months. She has been in a foster home for several years. There is no evidence that her adjustment to that environment is less than satisfactory. To force her return to mother's custody could create stress and tension that would serve the best interests of neither Dorothy nor mother.

## DECISION

The trial court erred in applying Minn. Stat. § 518.17 (1982) to transfer custody. Evidence is insufficient to support a transfer of custody under Minn.Stat. § 518.18 (1982). The trial court abused its discretion when it suspended mother's visitation in the absence of persuasive evidence that visitation would be harmful to the children.

The issue of whether the trial court abused its discretion in retaining an expert initially obtained by the respondent as a witness is not properly before the court.

The trial court did not improperly delegate its judicial authority in permitting the 17-year old daughter to decide when she wished to return to her mother's physical custody.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.