*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0362**

Donna Jean Sjolander
f/k/a Donna Jean Carlson, petitioner,
Respondent,

vs.

Steven Gary Carlson,
Appellant.

**Filed April 11, 2016
Affirmed in part, reversed in part, and remanded
Schellhas, Judge**

Clay County District Court
File No. 14-F9-07-001060

Melinda Hanson Weerts, Melinda Weerts Law, PLLC, Fargo, North Dakota (for respondent)

Susan L. Ellison, Ohnstad Twichell, P.C., West Fargo, North Dakota (for appellant)

Laurie Christianson, Moorhead, Minnesota (guardian ad litem)

Considered and decided by Schellhas, Presiding Judge; Johnson, Judge; and Smith, John, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**SCHELLHAS**, Judge

In this parenting-time dispute, appellant-father contends that the district court erred by failing to sanction respondent-mother for her contempt of court and by terminating his court-ordered parenting time with the parties' two minor children. Respondent-mother filed a notice of related appeal to challenge the district court's contempt finding. We affirm the contempt finding, but we conclude that the district court abused its discretion by not sanctioning respondent-mother for her contempt and by terminating appellant-father's parenting time. We therefore reverse and remand to the district court for further proceedings.

## FACTS

Appellant-father Steven Gary Carlson and respondent-mother Donna Jean Sjolander, f/k/a Donna Jean Carlson, are the parents of two minor daughters, S.O.C., born in April 2000, and L.K.C., born in December 2001, and one now-adult daughter, S.E.C., born in December 1994. In 2009, the district court dissolved the parties' marriage by partial decree and granted father temporary supervised parenting time.[1] The court subsequently terminated father's supervised visitation due to his conduct during the visits and ordered father to engage in family therapy with S.E.C., S.O.C., and L.K.C.[2]

---

[1] At the time of the dissolution, an order for protection was in effect against father for the protection of mother and the children.

[2] The district court subsequently terminated the family-therapy order with respect to S.E.C. for lack of benefit.

2

In 2010, the district court entered an amended dissolution judgment and granted mother sole legal and physical custody of S.E.C., S.O.C., and L.K.C. The court found that "unrestricted parenting time [for father] w[ould] endanger the children's physical or emotional health or development" and continued the order for family therapy between father and S.O.C. and L.K.C. (the children), with the goal to "mend [father's] relationships with [the] children and move forward towards unrestricted parenting time." But the family therapy ceased due to a deterioration of father's mental health and a lack of cooperation by mother and the children.

In 2012, the district court appointed a guardian ad litem (GAL) for the children and ordered psychological evaluations of father and the children to determine the mental status of father and the children and "the feasibility of beginning family reunification therapy." These psychological evaluations were not completed.

In January 2013, the GAL reported that father was participating in behavioral therapy and recommended the commencement of efforts to reunify father and the children. The GAL noted the children's knowledge that their mother and S.E.C. did not want them to see father and their belief that they would disappoint and anger their mother and S.E.C. if they saw father. The GAL subsequently testified that the children wanted to see father but believed that mother and S.E.C. "would be mad if they wanted to see him." The district court found that father "ha[d] undergone extensive therapy" and "made great strides" in his mental health and that father's exercise of parenting time with the children "[wa]s not likely to endanger their physical or emotional health or impair their emotional development." The court ordered "[a] process of reunification between [father] and [the

children], evolving into substantial parenting time, [to] begin forthwith" and instructed mother to fully cooperate with the reunification process.

In May 2013, the GAL reported that no reunification progress between the children and father had occurred because mother "ha[d] circumvented every effort to make reunification possible." The reunification therapist reported that the lack of reunification progress was due in part "to the influence of mother's strong negative reports regarding [father]," mother's repetition of "[r]ehearsed memories" about father's behavior with the children, and "[mother's] adamancy in front of her daughters that it will 'never be safe' for the girls to see [father]." Father asked the district court to find mother in contempt of court for failing to cooperate with reunification therapy. The court declined to do so, stating that "[a]lthough the Court strongly suspects that [mother] has been impeding the reunification process, the Court cannot substantiate any overt act that would constitute contempt of Court." The court again ordered that a reunification process begin and that mother fully cooperate with the process.

In the summer of 2013, reunification sessions between the children and father began, and the reunification therapist "noted no evidence of fear or anxiety in [the children] in the presence of their father," that father "cooperated well with expectations of how he should interact with his children," and that "progress during sessions [wa]s moving slowly, but still appear[ed] possible." But that fall, reunification sessions ended because the children refused to participate in the sessions. Father then moved the district court to establish a supervised parenting-time schedule. At a December 2013 evidentiary hearing, the reunification therapist opined that mother had tried to alienate the children from father,

4

and the GAL testified that she never had experienced a case of "this intense alienation from one parent towards the other."

In January 2014, the district court found "that for the past several years, at least since December 2011, [father] has not posed any threat to the welfare of his children, and that no safety concerns have been evident since at least that time." The court further found that "[mother] ha[d] resisted, interfered with and sabotaged all attempts to therapeutically reunite the children with their father" and "to allow [father] to enjoy a parenting relationship with his children." The court established a specific supervised parenting-time schedule and ordered mother to cooperate with the schedule, including transportation of the children to and from parenting-time visits. The court also ordered mother to "insist that the children take part in the visits with their father"; "encourage the children to take part in, and enjoy their time with their father" and "have a relationship with their father"; "convey a positive attitude to the children regarding their father and the[] visits"; refrain from "interrogat[ing] the children after the visits"; "cease and desist" from "mak[ing] any disparaging or negative remarks about the Court's Order, the parenting plan schedule, [the parenting-time supervisor, father, or the GAL]"; and promptly pay half of the cost of the parenting-time supervisor. The court cautioned mother that it would "seriously consider permanently transferring the physical and legal custody of the children to [father], and thereafter requiring all of [mother]'s parenting time be supervised," if mother failed to comply with the court's order.

After several court-ordered visits, the parenting-time supervisor reported that the children appeared to be sad, angry, and sometimes defiant during the visits; that S.O.C.

continually accused father of past abuse; and that L.K.C. had not spoken one word to father or maintained eye contact with him. But the parenting-time supervisor also noted that the children did not appear "scared or threatened" during the visits, and she opined that the visits did not pose any risk to the children's safety; in fact, the supervisor suggested that the duration of the visits be increased. After about one month, the visits ceased because the children refused to attend the scheduled visits.

In February 2014, father moved the district court to find mother in contempt of court by "failing to encourage the children to participate in the visitation," "insist that the children cooperate and take part in the visits," "convey a positive attitude to the children regarding their father and the visits," "encourage the children to have a relationship with their father," "follow the Court's directives in relation to visitation with [father]," and pay half the cost of the parenting-time supervisor. Father proposed sanctions for mother's contempt that included payment of a civil penalty or bond, payment of father's attorney fees and costs, jail time, and redirection of father's child-support payments to the parenting-time supervisor. Mother moved the court to, among other things, vacate or modify the parenting-time schedule. The court conducted evidentiary hearings between March and May 2014.

In August 2014, the district court found mother in contempt of court for "her consistent failure and refusal to comply with multiple orders of th[e] court to cooperate in efforts to effect a reconciliation of the minor children . . . with their father, and her consistent pattern of conduct designed to further alienate the children from their father." The court noted the testimony of the GAL and parenting-time supervisor regarding

mother's alienation of the children from father and mother's "constant reinforcement" that father had sexually abused S.O.C. and infected her with a sexually transmitted disease, although medical records did not support the claim. But the court declined to sanction mother for her contempt, stating that "any punishment which the court might impose upon her, whether fine or imprisonment, would adversely affect the well-being of the minor children, since there is no one else to care for them, and her financial situation is already poor." And the court found that the reconciliation efforts were having a "serious detrimental effect" on the children, "creat[ing] and . . . exacerbate[ing] anxiety, stress and depression in the [children]," and that the reconciliation efforts were not in the children's best interest. The court therefore terminated "[c]ourt-ordered efforts to effect reconciliation between the minor children . . . with their father" and ordered father to "have no uninvited contact with [the children] prior to their 18th birthdays." Father moved for reconsideration, and the court affirmed its order, stating that the August 2014 order "did not terminate or restrict [father]'s parenting time" and "left parenting time wide open for [father], but only upon the initiative of his daughters."

This appeal follows.

## D E C I S I O N

### I.

"The district court's decision to invoke its contempt powers is subject to reversal for abuse of discretion." *In re Welfare of Children of J.B.*, 782 N.W.2d 535, 538 (Minn. 2010). An appellate court "will reverse the factual findings of a civil contempt order only if [the] findings are clearly erroneous." *Id.* (citing Minn. R. Civ. P. 52.01).

7

"Civil contempt is failing to obey a court order in favor of the opposing party in a civil proceeding." *Newstrand v. Arend*, 869 N.W.2d 681, 692 (Minn. App. 2015) (quotation omitted), *review denied* (Minn. Dec. 15, 2015).

> [A] civil contempt proceeding must meet the following minimum requirements:
> (1) the court has jurisdiction over the subject matter and the person;
> (2) a clear definition of the acts to be performed;
> (3) notice of the acts to be performed and a reasonable time within which to comply;
> (4) an application by the party seeking enforcement giving specific grounds for complaint;
> (5) a hearing, after due notice, to give the nonperforming party an opportunity to show compliance or the reasons for failure;
> (6) a formal determination by the court of failure to comply and, if so, whether conditional confinement will aid compliance;
> (7) an opportunity for the nonperforming party to show inability to comply despite a good faith effort; and
> (8) the contemnor's ability to gain release through compliance or a good faith effort to comply.

*Mower Cty. Human Servs. ex rel. Swancutt v. Swancutt*, 551 N.W.2d 219, 223 (Minn. 1996) (citing *Hopp v. Hopp*, 279 Minn. 170, 174–75, 156 N.W.2d 212, 216–17 (1968)).

*Finding of contempt*

Mother challenges the district court's finding of contempt, arguing that the record lacks "a clear order defining what actions the court required of her" and "evidence and particular findings as to conduct violating said order." Mother's argument is unavailing. The court's January 2014 order required mother to cooperate with the parenting-time schedule; transport the children to and from parenting-time visits; "insist that the children take part in the visits with their father"; "encourage the children to take part in, and enjoy

8

their time with their father" and "have a relationship with their father"; "convey a positive attitude to the children regarding their father and the[] visits"; refrain from "interrogat[ing] the children after the visits"; "cease and desist" from "mak[ing] any disparaging or negative remarks about the Court's Order, the parenting plan schedule, [the parenting-time supervisor, father, or the GAL]"; and promptly pay half the cost of the parenting-time supervisor. The record reflects that the court did not clearly err in finding that mother violated several parts of the January 2014 order. After S.O.C. ended her first visit with father early, mother neither encouraged S.O.C. to continue the visit nor insisted—or attempted to insist—that S.O.C. cooperate; in fact, S.O.C. left with mother. L.K.C. refused to participate in any visit with father. In the children's presence, mother told the parenting-time supervisor that the visits constituted child abuse. Mother bought the children tape recorders to wear during their visits with father and had S.E.C. transcribe the recordings "to use . . . as evidence." Mother made no court-ordered payments to the parenting-time supervisor.

The record supports the district court's finding that mother violated the January 2014 order by consistently refusing "to cooperate in efforts to effect a reconciliation of the minor children . . . with their father" and by engaging in a "consistent pattern of conduct designed to further alienate the children from their father." The court did not abuse its discretion by finding mother in contempt.

*Sanction for contempt*

Father argues that the district court abused its discretion by declining to sanction mother for her contempt. "In exercising civil contempt powers in divorce cases, the only

objective is to secure compliance with an order presumed to be reasonable. Punishment for past misconduct is not involved; that is a field reserved to criminal proceedings of which criminal contempt is one example." *Hopp*, 279 Minn. at 173, 156 N.W.2d at 216 (emphasis omitted); *see also Swancutt*, 551 N.W.2d at 222 (stating that "[c]ivil contempt sanctions are intended to operate in a prospective manner and are designed to compel future compliance with a court order" (quotation omitted)). Father correctly points out that the district court erred by focusing on the availability of an appropriate "punishment" for mother's civil contempt. We reverse the district court's decision not to impose a contempt sanction and remand for determination and imposition of an appropriate sanction or sanctions to compel mother's compliance with court orders and to identify conditions for purging mother's contempt. On remand the court shall consider all available contempt remedies described by father in his March 12, 2014 response to mother's counter-motions in district court.

## II.

"Appellate courts recognize that a district court has broad discretion to decide parenting-time questions, and will not reverse a parenting-time decision unless the district court abused its discretion by misapplying the law or by relying on findings of fact that are not supported by the record." *Newstrand*, 869 N.W.2d at 691 (quotation omitted). "A district court's findings of fact underlying a parenting-time decision will be upheld unless they are clearly erroneous." *Id.* (quotation omitted). "A finding is clearly erroneous if [an appellate court is] left with the definite and firm conviction that the [district] court made a mistake." *SooHoo v. Johnson*, 731 N.W.2d 815, 825 (Minn. 2007).

The district court stated that its August 2014 order "did not terminate or restrict [father]'s parenting time" because "[father] has not had parenting time since the parties were divorced in January 2009." But this statement is inconsistent with the court's January 2014 order that established a "parenting time schedule." On appeal, the parties agree that the August 2014 order terminated father's court-ordered parenting time.

"If modification would serve the best interests of the child, the court shall modify . . . an order granting or denying parenting time, if the modification would not change the child's primary residence." Minn. Stat. § 518.175, subd. 5(a) (2014); *see also Hagen v. Schirmers*, 783 N.W.2d 212, 216 (Minn. App. 2010) (stating that child's best interest is ultimate concern in parenting-time dispute). "[T]he court may not restrict parenting time unless it finds that: (1) parenting time is likely to endanger the child's physical or emotional health or impair the child's emotional development; or (2) the parent has chronically and unreasonably failed to comply with court-ordered parenting time." Minn. Stat. § 518.175, subd. 5(b) (2014); *see also Dahl v. Dahl*, 765 N.W.2d 118, 123–24 (Minn. App. 2009) (stating that "[a] restriction occurs when a change to parenting time is substantial" and that "[m]odifications are less substantial changes in parenting time" (quotations omitted)). Here, the district court substantially changed and restricted father's parenting time by terminating his court-ordered parenting time entirely. We consider whether the court abused its discretion by restricting father's parenting time.

"[A] party must demonstrate a significant degree of danger" to establish endangerment to a child. *Goldman v. Greenwood*, 748 N.W.2d 279, 285 (Minn. 2008) (quotation omitted) (discussing child endangerment in context of custody modification).

11

"[A] complete, contingent or temporary denial of visitation is a grave matter and warranted only by endangerment of a child's physical or emotional health or development." *D.A.H. v. G.A.H.*, 371 N.W.2d 1, 4 (Minn. App. 1985), *review denied* (Minn. Sept. 19, 1985); *see also Young v. Young*, 370 N.W.2d 57, 64–65 (Minn. App. 1985) (stating that "[w]ith the exception of total termination of parental rights or permanent suspension of visitation, [temporary suspension of visitation] is the harshest sanction which can be imposed upon a parent and upon a child" and reversing temporary suspension of mother's visitation as unjustified by record), *review denied* (Minn. Sept. 13, 1985).

The record does not support the district court's finding that father's parenting time endangers the children's emotional health. As above noted, in early 2013, the court found that father had participated in "extensive therapy," that parenting time was "not likely to endanger [the children's] physical or emotional health or impair their emotional development," and that "reunification . . . evolving into substantial parenting time" was appropriate. And in January 2014, the court found that "there is no credible evidence in the record that [father] is presently a threat or a safety concern to his children," that "at least since December 2011, [father] has not posed any threat to the welfare of his children, and that no safety concerns have been evident since at least that time." The parenting-time supervisor testified that father created a safe and welcoming environment for his visits with the children in the home that he shares with his parents and that the children were repeatedly reassured that they were safe. Father exhibited patience with the children, attempting to redirect S.O.C. when she made accusations against him and reading to L.K.C. despite her refusal to interact with him. The supervisor reported that father was "consistent

12

in his attempts to interact" with the children despite the "very tense environment" and that he "frequently t[old] each of them how much he loves them and how grateful he is to see them again." She reported that the children did not appear scared or threatened during the visits, recommended that the supervised visits continue, and suggested that the duration of the visits be increased.

The district court found that mother had emotionally damaged the children. This finding is supported by the record and is not clearly erroneous. While the children experienced stress and anxiety leading up to and during their visits with father, the record establishes that this was due to mother's negative influence on the children and her consistent efforts to alienate them from father. Noting the GAL and parenting-time supervisor's opinions that this case is "the worst case of parental alienation" they have encountered, the court found that mother "has done cruel and egregious harm to her children—harm which will affect their outlooks on life and the world, and will likely cause them problems with relationships throughout their lives." Mother's "consistent pattern of conduct designed to . . . alienate the children from their father" is unacceptable. *See Lemcke v. Lemcke*, 623 N.W.2d 916, 919–20 (Minn. App. 2001) ("A majority of courts, including Minnesota courts, agrees that a sustained course of conduct by one parent designed to diminish a child's relationship with the other parent is unacceptable and may be grounds for denying or modifying custody." (citing *Henrikson v. Henrikson*, 288 Minn. 532, 532–33, 179 N.W.2d 284, 285 (1970))), *review denied* (Minn. June 19, 2001).

On this record, we are left with the definite and firm conviction that the district court clearly erred by finding that parenting time with father endangers the children's emotional

13

health. We conclude that the court abused its discretion by terminating father's court-ordered parenting time. We therefore reverse the termination of father's parenting time, remand for reinstatement of the parenting-time schedule established in the January 2014 order, and direct the district court to revisit father's request for compensatory parenting time. Although we recognize the court's broad discretion regarding the establishment of parenting time, we strongly suggest that transportation related to the children's parenting time with father not be provided by mother. We also suggest that the court maintain continuity of professionals involved in the case to the extent that the GAL and other professionals are willing and available.

**Affirmed in part, reversed in part, and remanded.**