## MINNESOTA STATE BAR ASSOCIATION v. DIVORCE ASSISTANCE ASSOCIATION, INC. RICHARD F. DOYLE, APPELLANT.

248 N. W. 2d 733.

December 17, 1976—No. 45539.

*Arthur, Chapman, McDonough & Michaelson* and *Lindsay G. Arthur, Jr.,* for appellant.

*Collins & Buckley, Theodore J. Collins,* and *Morley Friedman,* for respondent.

*Randall D. B. Tigue* and *Larry Espel,* Law Student, for Minnesota Civil Liberties Union, amicus curiae, seeking reversal.

Considered and decided by the court en banc.

PETERSON, JUSTICE.

Minnesota State Bar Association has instituted an action seeking an injunction to prohibit the activities of Divorce Assistance Association, Inc.,[1] and Richard F. Doyle, claiming that they are engaged in the unlawful practice of law, Minn. St. 481.02, subd. 1, and are unlawfully advertising for divorce business, Minn. St. 518.29. Doyle was held in contempt for refusing to obey a pretrial order that he respond to a subpoena duces tecum and answer questions asked at a deposition. This appeal followed. The main issue for decision is whether the Fifth Amendment privilege against compulsory self-incrimination justified Doyle's refusal to comply.

The facts are these. After commencing its action plaintiff served a subpoena duces tecum and a notice for the taking of a deposition. At the time of taking the deposition, on November 15, 1974, Doyle refused to answer certain questions put to him by plaintiff's attorney and refused to produce any of the documents sought by the subpoena. The taking of the deposition was consequently adjourned and resumed later that day in the presence of a district court judge. Doyle again refused to answer any of the 22 questions posed by plaintiff's attorney or to produce any of the subpoenaed records, in most instances invoking the Fifth Amendment privilege against compulsory self-incrimination. The court in each instance ordered Doyle to respond and in each instance Doyle refused to do so. The court then ordered Doyle held in contempt and sentenced him to 30 days in the workhouse, staying execution for 10 days for Doyle to perfect an appeal.

A preliminary summary of the general principles of Fifth Amendment jurisprudence which govern analysis of the issues in this case may be stated at the outset. For purposes of cross-

---

[1] Although denominated in the complaint as a corporation, defendants represented on oral argument that the association is not in fact incorporated. The secretary of state confirms that, although the name was reserved, no incorporation under that name has been filed.

reference at subsequent points in the opinion, each principle will be numbered.

1.   The Fifth Amendment privilege is available to a witness, including a party, at any stage in a civil proceeding (and not just to a defendant in a criminal proceeding). Among the numerous decisions of the United States Supreme Court, see Kastigar v. United States, 406 U. S. 441, 92 S. Ct. 1653, 32 L. ed. 2d 212 (1972). (Our own Rule 26.02, Rules of Civil Procedure, moreover, specifically provides that a party in a civil action may discover from another party only matters that are "not privileged.")

2.   The privilege is properly invoked when the testimony or papers sought would tend to incriminate the witness. He need only show that the testimony or papers would provide a "link in the chain of evidence" required for prosecution and that a chance of prosecution exists. Blau v. United States, 340 U. S. 159, 71 S. Ct. 223, 95 L. ed. 170 (1950); McCormick, Evidence (2 ed.) § 139.

3.   The court and not the witness is the judge of whether there is a tendency to incriminate, but the United States Supreme Court has held that the court should reject an assertion of privilege only where it is " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that * * * the answer[s] *cannot possibly* have such tendency' to incriminate." Hoffman v. United States, 341 U. S. 479, 488, 71 S. Ct. 814, 819, 95 L. ed. 1118, 1125 (1951); citing Temple v. Commonwealth, 75 Va. 892, 898 (1881), cited with approval in Counselman v. Hitchcock, 142 U. S. 547, 579, 12 S. Ct. 195, 204, 35 L. ed. 1110, 1120 (1892). In determining whether it is clear that the witness' assertion of privilege is improper, the court should not require that the witness explain why he cannot respond, if to do so could result in injurious disclosure. Hoffman v. United States, *supra*.

4.   The privilege does not extend to a corporation or an incorporated association, thus a custodian of the records of a corporation or an association must produce subpoenaed records even though information in the records may incriminate him per-

sonally. The only exception to this rule is in the case of those unincorporated associations which are so personal in the scope of their membership and activities that they may be said "to embody or represent the purely private or personal interests" of their constituents. United States v. White, 322 U. S. 694, 701, 64 S. Ct. 1248, 1252, 88 L. ed. 1542, 1547 (1944); Bellis v. United States, 417 U. S. 85, 94 S. Ct. 2179, 40 L. ed. 2d 678 (1974). Although a custodian of corporate records may be required to produce and authenticate such records, he may not be required to testify as to the whereabouts of items not produced. Curcio v. United States, 354 U. S. 118, 77 S. Ct. 1145, 1 L. ed. 2d 1225 (1957). A limitation on this principle is stated in Fisher v. United States, 425 U. S. 391, 409, 96 S. Ct. 1569, 1580, 48 L. ed. 2d 39, 56 (1976), where the court held that implicitly admitting, by responding to questions as to location, the existence and possession of papers whose existence, location, and possession is a foregone conclusion and not in issue does not rise to the level of compelled testimony protected by the Fifth Amendment.

5.   When the privilege is applicable, the witness may be compelled to testify or produce documents only if he is granted immunity from the subsequent use against him of both the information he gives and any fruits of that information, the so-called use and derivative use immunity. Before a court may hold a witness in contempt for refusing to answer questions that would otherwise be incriminating, the judge must make it clear to the witness that he is being offered immunity in exchange for his testimony. See, Maness v. Meyers, 419 U. S. 449, 472, 95 S. Ct. 584, 598, 42 L. ed. 2d 574, 591 (1975) (concurring opinion, White, J.). See, also, Stevens v. Marks, 383 U. S. 234, 246, 86 S. Ct. 788, 794, 15 L. ed. 2d 724, 732 (1966):

"* * * [T]he State may not substitute for the privilege against self-incrimination an intricate scheme for conferring immunity and thereafter hold in contempt those who fail fully to perceive its subtleties."

And, further (383 U. S. 246, note 11, 86 S. Ct. 795, 15 L. ed. 2d 733):

"* * * A State must affirmatively demonstrate to the witness that a valid immunity from prosecution is his before it may hold him in contempt for refusing to answer questions that would otherwise be incriminating. Whether the State has met its burden must be measured at the time of the alleged contempt. A declaration that there was a valid immunity uttered for the first time on appeal would come too late."

6. If the court does not offer immunity in exchange for testimony protected by the privilege, then the witness has the right to refuse to testify. See the concurring opinion of Mr. Justice White in Maness v. Meyers, *supra*. By doing so the witness subjects himself to a possible contempt order, but this contempt order is appealable, thus providing the witness with a means of securing precompliance review. Maness v. Meyers, 419 U. S. 449, 460, 95 S. Ct. 584, 592, 42 L. ed. 2d 574, 584. While a witness may choose to answer when ordered to do so and still preserve his right to object to the subsequent use of the evidence or its fruits in a prosecution, Lefkowitz v. Turley, 414 U. S. 70, 78, 94 S. Ct. 316, 322, 38 L. ed. 2d 274, 282 (1973), the fact that the witness may follow this alternative procedure for pressing a Fifth Amendment claim does not preclude him from risking contempt instead. Maness v. Meyers, *supra*.

It is clear that Doyle had a right to follow the procedure of refusing to respond to the questions and subpoena, thus securing precompliance review of the trial court's rulings on his assertions of privilege. This conclusion follows from the facts that Doyle was neither protected by a statutory grant of immunity nor assured by the trial judge or prosecuting authorities that immunity would be granted to him, and from principles 5 and 6, above. Therefore, if the questions and subpoena were aimed in any part at eliciting information as to which the privilege could properly be asserted, see principles 2 to 4, above, the contempt order is

invalid at least as to those questions and requests for documents.

We turn then to an examination of the validity of Doyle's assertion of privilege with respect to each question and each request for documents. The questions and requests can be broken down into several categories for purposes of this analysis. For simplification, the questions and requests for documents are reproduced in full in an appendix to this opinion, but will in the main be referred to in the body of the opinion by their numerical or alphabetical designations.

The first group of questions we consider seeks to elicit from Doyle testimony that could directly tend to incriminate him. For example, an affirmative response to question 6, "Do you engage in advising people as to what their rights are under the law?", would clearly tend to incriminate Doyle under Minn. St. 481.02, which makes unauthorized practice of law a misdemeanor. Questions 20 and 21 also fall into this category.

Most of the questions posed to Doyle do not seek testimony which could directly incriminate him, but, rather, seek testimony which could constitute one link in the chain of evidence tending to connect Doyle with illegal activities. In accordance with principles 2 and 3, above, we conclude that Doyle properly asserted the privilege as to questions 1, 3, 5, 10, 11, 15, 16, 17, 18, 19, and 22. See, Malloy v. Hogan, 378 U. S. 1, 12, 84 S. Ct. 1489, 1496, 12 L. ed. 2d 653, 662 (1964), where the United States Supreme Court held, on the basis of these principles, that such a seemingly innocuous question as whether the witness knew "John Bergoti," was protected by the privilege in the context of that case.

The next group of questions—4, 12, 13, and 14—all attempt to elicit testimony from Doyle concerning the existence and whereabouts of records and other written documents relating to the association. We conclude on the basis of Curcio v. United States, 354 U. S. 118, 77 S. Ct. 1145, 1 L. ed. 2d 1225 (1957), discussed with reference to principle 4, that Doyle properly asserted Fifth Amendment privilege as to these questions.

The final category of questions and requests as to which Doyle properly asserted the Fifth Amendment privilege includes Items A, C, and D of the subpoena calling for the production of all books, records, documents, files, and papers relating to Doyle's and the association's activities in divorce counseling. The defect in these requests is that they fail to distinguish between personal records and business records. The principle that a person's "private papers" are shielded from compelled disclosure when they would tend to incriminate him was first enunciated by the United States Supreme Court in Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. ed. 746 (1886). In contrast, non-private papers are not shielded by the Fifth Amendment, as Fisher v. United States, 425 U. S. 391, 96 S. Ct. 1569, 48 L. ed. 2d 39 (1976), recently reaffirmed.[2] As explained in the discussion of principle 4, the privilege does extend to documents of an unincorporated association which is so personal in the scope of its membership and activities that it represents the purely personal interests of its constituents.

Although some of the documents requested by these items on the subpoena may not be shielded from disclosure as "private papers" or as records of a "personal association," Doyle cannot validly be held in contempt for refusing to comply with a subpoena calling even in part for privileged documents. See, Bowman Dairy Co. v. United States, 341 U. S. 214, 221, 71 S. Ct. 675, 679, 95 L. ed. 879, 885 (1951) : "One should not be held in contempt under a subpoena that is part good and part bad. The burden is on the court to see that the subpoena is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad."

---

[2] Fisher v. United States, 425 U. S. 391, 96 S. Ct. 1569, 48 L. ed. 2d 39 (1976), and the subsequent case of Andresen v. Maryland, 427 U. S. 463, 96 S. Ct. 2737, 49 L. ed. 2d 627 (1976), seem to portend significant departure from the sweeping pronouncements of Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. ed. 746 (1886), but not in a way affecting decision in this case other than stated in this opinion.

Summing up thus far, we hold that most of the questions and requests for documents at issue undertook to elicit information of such a nature that Doyle validly invoked the Fifth Amendment privilege in refusing to respond.

As to some questions and subpoenaed items, however, Doyle's refusal to comply with the court's orders to respond was neither justified by the Fifth Amendment privilege nor by any other privilege. Included in this category are questions 7 to 9, dealing with Doyle's previous marital status. Doyle did not object to these questions on the basis of the Fifth Amendment privilege, but, rather, on the basis of irrelevancy. Even if the irrelevancy of the questions were conceded, Doyle would still be subject to a contempt citation for his failure to comply with the court's order to respond. It is well established that an order directing a witness to answer questions must be obeyed, and a failure to obey such order subjects the witness to a contempt citation, even if the order was erroneous or improvident. See, Maness v. Meyers, 419 U. S. 449, 458, 95 S. Ct. 584, 591, 42 L. ed. 2d 574, 582 (1975). The principle that a witness cannot be cited for contempt for refusing to answer questions on the basis of a valid assertion of the Fifth Amendment privilege is one of the few exceptions to the foregoing general rule. Maness v. Meyers, *supra*; Dike v. Dike, 75 Wash. 2d 1, 9, 448 P. 2d 490, 495 (1968).

In two other instances Doyle did not have a proper basis to assert the claim of Fifth Amendment privilege. First, regarding question 2, which inquired whether he was licensed to practice law in Minnesota, the fact that Doyle had already admitted in the pleadings that he was not so licensed obviously constituted a waiver of his right to refuse to testify on this matter at the deposition. See, Kaminsky, *Preventing Unfair Use of the Privilege Against Self-Incrimination in Private Civil Litigation: A Critical Analysis*, 39 Brooklyn L. Rev. 121, 137. Second, Doyle's refusal to produce his income tax returns requested by Item B of the subpoena was not justified by the Fifth Amendment privilege. This conclusion follows from the recent decision in Garner

v. United States, 424 U. S. 648, 96 S. Ct. 1178, 47 L. ed. 2d 370 (1976), which held that when a defendant makes incriminating disclosures on his tax returns rather than claiming his privilege against self-incrimination, he is foreclosed from invoking the privilege as to such information when it is later used as evidence in a criminal prosecution.

The orders to respond and the contempt sanction were therefore unjustified with regard to all but 5 of the questions and requests for documents directed to Doyle. It remains to be determined whether the contempt order should be reversed as being based largely on incorrect orders to respond, which, if obeyed, would have deprived Doyle of his privilege against self-incrimination. On appeal from a contempt order, the reviewing court may determine the reasonableness, arbitrariness, or discriminatory character of such order and may reverse or modify the order if it concludes that the trial court abused its discretion in entering that order. 17 C. J. S., Contempt, §§ 124(1), 124(5), 125.

One limitation on the trial court's admittedly broad discretion to impose a contempt sanction is that such sanction is appropriate only where the alleged contemnor has acted contumaciously, in bad faith, and out of disrespect for the judicial process. See generally, 17 C. J. S., Contempt, §§ 1 to 3. The record is devoid of any indication, as plaintiff acknowledges, that Doyle engaged in any conduct of a contumacious or disrespectful character. This circumstance, together with the fact that the order holding him in contempt apparently was based upon refusal to answer both privileged and unprivileged questions, prompts us to reverse and remand for the trial court's reconsideration.[3]

---

[3] Questions 7 to 9, which should have been answered, plainly referred to extraneous matters and question 2 related to a matter which stood admitted on the pleadings. The most important and relevant question relating to his income tax return has a quite different attribute of good faith. Although we hold that Doyle's refusal to furnish copies of his income tax return was not justified by Fifth Amendment privilege, the status of that privilege was at that time unclear since the United States

The contempt order in its present form is vulnerable on yet another ground. The form of the order appears to be one for criminal, rather than civil, contempt. Criminal contempt is conduct directed against the dignity and authority of the court. The sanction is inflicted primarily as punishment for the past disrespectful or contumacious conduct and in vindication of public authority. Civil contempt, in contrast, is failing to obey a court order in favor of the opposing party in a civil proceeding. The sanction is inflicted primarily as inducement for future compliance with the order and in vindication of the opposing party's rights. 17 C. J. S., Contempt, §§ 5 to 7; 4 Dunnell, Dig. (3 ed.) § 1703a.

The sanctions for criminal and civil contempt are distinct, consistent with the disparate purposes for which they are imposed. Since a criminal contempt citation is imposed as a punishment for past, completed action by the contemnor, it is absolute and not subject to mitigation if the contemnor alters his future conduct. Since the purpose behind a civil contempt citation is coercive, it is often said that such a citation affords the contemnor the keys to his jail cell in that the sentence is conditioned upon his continued noncompliance with the court order. The contempt order herein, imposing a flat 30-day sentence and not specifying that Doyle could purge himself by complying with the orders to respond, is clearly one for criminal contempt and, hence, inappropriate even as to Doyle's wrongful refusals to respond. However, a properly drawn civil contempt order—the elements of which we delineated in Hopp v. Hopp, 279 Minn. 170, 156 N. W. 2d 212 (1968)—would be an appropriate method for effecting compliance with an order to respond.

---

Supreme Court had not yet rendered its opinion in Garner v. United States, 424 U. S. 648, 96 S. Ct. 1178, 47 L. ed. 2d 370 (1976). It is noteworthy that a panel of judges of the Ninth Circuit Court of Appeals had first held that refusal to produce income tax returns was privileged but only following a rehearing en banc was a contrary decision made by a closely divided court. Garner v. United States, 501 F. 2d 228 (9 Cir. 1972).

We reverse the contempt order on the basis of Doyle's Fifth Amendment claim and remand for further proceedings not inconsistent with this opinion. The court may tailor its order to require that Doyle respond to those individual questions and requests which do not infringe upon his Fifth Amendment privilege. A reading of the several opinions in Fisher v. United States, 425 U. S. 391, 96 S. Ct. 1569, 48 L. ed. 2d 39 (1976), indicates, however, that it may be a formidable task, with regard to Items A, C, and D, to separate the privileged personal records from unprivileged, non-private records of defendants.

Reversed and remanded.

MR. JUSTICE TODD took no part in the consideration or decision of this case.

APPENDIX: Questions put to Mr. Doyle at his deposition and subpoenaed items.

1. Q: Mr. Doyle, are you familiar with the organization known as Divorce Assistance Association, Inc.?

2. Q: Mr. Doyle, are you licensed to practice law in the State of Minnesota?

3. Q: I show you Mr. Doyle what has been marked as Deposition Exhibit 2, and ask you, if you recognize that document?

4. Q: Do you have any books or records—bank books, deposit books, any books or any other written documents in your possession relating to Divorce Assistance Association or Men's Rights Association?

5. Q: Did you receive any income from Men's Rights Association, Divorce Assistance Association?

6. Q: Do you engage in advising people as to what their rights are under the law?

7. Q: Mr. Doyle, are you divorced?

8. Q: Where were you divorced, Mr. Doyle?

9. Q: Are you currently under any support alimony orders issued by any Courts?

10. Q: Mr. Doyle, will you answer any questions relating

to your activities in connection with persons seeking divorces in the State of Minnesota?

11. Q: Have you engaged in counseling persons seeking divorces in the State of Minnesota?

12. Q: Are there such records?

13. Q: Who has custody of any records relating to your services or to the services of Divorce Assistance Association to the general public? Who has such records?

14. Q: Do you have any lists of persons who have paid money, either to yourself or to Divorce Assistance or Men's Rights Association for benefits of services?

15. Q: Do you accept money from persons who respond to ads placed in the paper by yourself in connection with divorce and/or dissolution?

16. Q: Have you placed advertisements in newspapers of general circulation relating to divorce or dissolution?

17. Q: Have you paid for advertising for Divorce Assistance or Men's Rights Association in connection with divorce or dissolution?

18. Q: Do you maintain a list of attorneys whom you think to be acceptable persons to handle divorce cases and dissolution cases in the State of Minnesota?

19. Q: Is Mr. Burke your present counsel and Mr. McDonough your counsel of this morning, are they upon some list of approved attorneys which you maintain for purposes of referring people to them from time to time in connection with divorce and dissolution?

20. Q: Mr. Doyle, have you advised persons of the proper manner of service of process?

21. Q: Have you advised persons of the proper way to respond to divorce and dissolution proceedings?

22. Q: Are any of your expenses paid for by persons who provide money to Divorce Assistance Association or Men's Rights Association?

A. Q: Item 2 [of the subpoena] called for you to produce

any books, records, documents and papers relating to your activities with Divorce Assistance Association. Do you have those books and records present?

B. Q: Mr. Doyle, item 7, the subpoena served upon you called you to produce your income tax records for the years '69 through '73. Do you have those tax returns with you?

C. Q: Item 8 [of the subpoena] called for you to produce all other books and papers relating to your activities in marriage, marriage counseling, divorce, dissolution divorce and dissolution counseling, pro se representation and pro se counseling. Have you produced any such items?

D. Q: Item 6 of the subpoena served on you asked for— called for you to produce all files, records and papers reflecting services rendered by yourself or Divorce Assistance Association to the public. Have you produced such books, records and papers here today?