**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0723**

In re the Matter of:

Jill Marie Newstrand, petitioner,
Respondent,

vs.

Jamison Robert Arend,
Appellant.

**Filed September 14, 2015**
**Affirmed**
**Schellhas, Judge**

Ramsey County District Court
File No. 62-FA-11-1273

Allison Maxim, Maxim Law, PLLC, St. Paul, Minnesota (for respondent)

Kellen T. Fish, KTF Law Firm, PLLC, Minneapolis, Minnesota (for appellant)

Considered and decided by Hudson, Presiding Judge; Cleary, Chief Judge; and Schellhas, Judge.

**S Y L L A B U S**

A court-ordered psychological evaluation under Minn. Stat. § 518.131, subd. 1 (2014), does not violate a parent's constitutional freedom of conscience when the order is based on concerns about the parent's mental health and fitness and no less-restrictive means exist to determine the parent's mental health and fitness.

A district court may restrict parenting time under Minn. Stat. § 518.175, subd. 1(a), (b) (2014), without making findings on the best-interest factors in Minn. Stat. § 518.17, subd. 1(a) (2014).

**O P I N I O N**

**SCHELLHAS**, Judge

Appellant challenges a judgment that imputes income to him for child-support purposes, without imputing income to respondent, and restricts his parenting time with his youngest child. Appellant argues that the district court's application of Minn. Stat. § 518.131, subd. 1, violated his constitutional freedom of conscience and that the court made inaccurate and insufficient best-interest findings under Minn. Stat. § 518.17, subd. 1(a). Appellant also argues that the court abused its discretion by declining to find respondent in constructive civil contempt of court. We affirm.

**FACTS**

Appellant Jamison Arend (father) and respondent Jill Newstrand (mother) never married but have three children: J.J.-M.A., born October 16, 1996; J.J.-I.A., born August 19, 2000; and J.J.I.A., born October 4, 2005. The parties signed recognitions of parentage for each child. On April 27, 2011, mother petitioned the district court to establish custody of the children. The district court appointed a guardian ad litem (GAL) to represent the children's best interests, granted mother temporary sole legal and sole physical custody of the children, and granted father temporary parenting time. Over the course of the proceedings, the court revisited its initial order several times and eventually

2

ordered the parties to obtain psychological evaluations and parenting assessments. Mother complied with the order; father refused based on his Rastafarian religious beliefs.

During a three-day evidentiary hearing, the parties resolved several issues by stipulation, including the following: (1) father would have sole legal and sole physical custody of J.J.-M.A. and J.J.-I.A.; (2) mother would have parenting time with J.J.-M.A. and J.J.-I.A. based on an agreed schedule; (3) mother would have sole legal and sole physical custody of J.J.I.A.; and (4) all of the children would have supervised time together. The parties submitted to a district court referee the unresolved issues of child support, father's parenting time with J.J.I.A., and contempt allegations. Adopting the referee's recommended findings and order, the district court imputed income to father and ordered him to pay $376 per month in basic child support plus a portion of J.J.I.A.'s child-care costs, granted father supervised parenting time with J.J.I.A., and found neither party in constructive civil contempt.

This appeal follows.

## ISSUES

I.      Did the district court err by imputing income to father and not imputing income to mother when calculating child support?

II.     As applied, does Minnesota Statutes section 518.131, subdivision 1, violate father's constitutional freedom of conscience?

III.    Did the district court abuse its discretion in establishing father's parenting time with J.J.I.A.?

IV.     Did the district court abuse its discretion by declining to find mother in constructive civil contempt?

3

**ANALYSIS**

**I.    The district court did not err by imputing income to father and not imputing income to mother when calculating child support.**

The first issue that father raises in his brief is his child-support obligation. "To determine the presumptive child support obligation of a parent, the court shall . . . determine the gross income of each parent . . . ." Minn. Stat. § 518A.34(a), (b) (2014). "[G]ross income includes . . . potential income under section 518A.32." Minn. Stat. § 518A.29(a) (2014). "If a parent is voluntarily unemployed, underemployed, or employed on a less than full-time basis, . . . child support must be calculated based on a determination of potential income. . . . [I]t is rebuttably presumed that a parent can be gainfully employed on a full-time basis." Minn. Stat. § 518A.32, subd. 1 (2014).

> Determination of potential income must be made according to one of three methods, as appropriate:
>
> (1) the parent's probable earnings level based on employment potential, recent work history, and occupational qualifications in light of prevailing job opportunities and earnings levels in the community;
> (2) if a parent is receiving unemployment compensation or workers' compensation, that parent's income may be calculated using the actual amount of the unemployment compensation or workers' compensation benefit received; or
> (3) the amount of income a parent could earn working full time at 150 percent of the current federal or state minimum wage, whichever is higher.

*Id.*, subd. 2 (2014).

A court's determination of income must be "based in fact" and will stand unless "clearly erroneous." *Schisel v. Schisel*, 762 N.W.2d 265, 272 (Minn. App. 2009).

4

Furthermore, "[w]hether a parent is voluntarily unemployed is a finding of fact, which [appellate courts] review for clear error." *Welsh v. Welsh*, 775 N.W.2d 364, 370 (Minn. App. 2009). "A finding is clearly erroneous if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Vangsness v. Vangsness*, 607 N.W.2d 468, 472 (Minn. App. 2000) (quotations omitted).

The district court imputed income to father equal to "150% of minimum wage ($7.25 an hour), or $10.88 per hour[,] . . . which is $1,885 gross per month." Father argues that the district court's income imputation was error. We disagree. The record reflects that father worked as a drywall taper for many years, earning approximately $850 per week. Mother testified that father chose not to continue that work and that he told her that he would work "miniscule" hours, delivering pizza or "whatever," to avoid paying child support. This evidence supports the court's finding that father is voluntarily unemployed, underemployed, or employed on a less than full-time basis. Based on father's earnings history, we conclude that the court did not err by imputing income to father, as allowed under Minn. Stat. § 518A.32, subd. 2(3).

Father also argues that the district court erred by not imputing income to mother. Mother testified that she was working 20 to 30 hours per week and that, when things with the children stabilized and after upcoming surgery, she intended to "go back to school and work as much as possible." A parent is not voluntarily unemployed, underemployed, or employed on a less than full-time basis if "the unemployment, underemployment, or employment on a less than full-time basis is temporary and will ultimately lead to an

increase in income." Minn. Stat. § 518A.32, subd. 3 (2014). On this record, we conclude that the court did not err by not imputing income to mother.

## II.     As applied, Minnesota Statutes section 518.131, subdivision 1, does not violate father's constitutional freedom of conscience.

The district court made the following finding:

> Despite the recommendations of the [GAL] and the orders of the Court, [father] has consistently refused to participate in a psychological evaluation, in a parenting assessment, and even in completing a co-parenting course. The Court notes that [father]'s in-court demeanor has been surly and defiant. His testimony on critical issues has not been credible.
>
> [Father]'s refusal to cooperate with these recommendations and directives of the Court is based upon religious convictions. More than once, [father] was informed by the Court that his refusal to comply with the directive to complete a psychological evaluation would result in the Court drawing negative inferences as to his mental health—which the Court has done.
>
> . . . .
>
> Parenting time is governed by the best interests of the child. One of the statutory "best interests" factors is the mental health of the parties. [Father] has refused to undergo a mental health evaluation, for religious reasons. His exercise of conscience does not obviate the statutory factor of his mental health. While [father] has exercised his First Amendment right to religious freedom, the Court cannot abandon [J.J.I.A.]'s right to have the legal protections afforded by examination of all factors in determining his best interests.

The court denied mother's request that the court find father in constructive civil contempt for his "refusal to cooperate with a psychological evaluation, a parenting assessment, and completion of a co-parenting course," stating

6

> [T]he Court has invoked the less-harsh remedy of drawing negative inferences, and there is no need to coerce [father] to comply with the directives for a mental health evaluation, a parenting assessment, and completion of the co-parenting class.

Father argues that the order requiring him to obtain a psychological evaluation under Minn. Stat. § 518.131, subd. 1, forced him to violate a tenet of his religion or suffer negative consequences on his parenting time with J.J.I.A. That statute provides as follows:

> In a proceeding brought for custody, dissolution, or legal separation, or for disposition of property, maintenance, or child support following the dissolution of a marriage, either party may, by motion, request from the court and the court may grant a temporary order pending the final disposition of the proceeding to . . . :
> . . . .
> (j) [r]equire one or both of the parties to perform or to not perform such additional acts as will facilitate the just and speedy disposition of the proceeding, or will protect the parties or their children from physical or emotional harm.

Minn. Stat. § 518.131, subd. 1. Father challenges the constitutionality of the statute, as applied to him, under the Minnesota Constitution. "[Appellate courts] review as-applied challenges to the constitutionality of statutes de novo." *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 657 (Minn. 2012). Article I, section 16, of the Minnesota Constitution states that

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed; . . . nor shall any control of or interference with the rights of conscience be permitted . . . ; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state . . . .

"[S]ection 16 precludes even an *infringement* on or an *interference* with religious freedom." *State v. Hershberger*, 462 N.W.2d 393, 397 (Minn. 1990). In evaluating the constitutionality of statutes that are challenged based on violations of freedom of conscience, the supreme court has "retain[ed] the compelling state interest balancing test." *Hill-Murray Fed'n of Teachers v. Hill-Murray High Sch.*, 487 N.W.2d 857, 865 (Minn. 1992). "This test has four prongs: whether the objector's belief is sincerely held; whether the state regulation burdens the exercise of religious beliefs; whether the state interest in the regulation is overriding or compelling; and whether the state regulation uses the least restrictive means." *Id.*

Under the first prong of the *Hill-Murray* test, we must determine whether father's belief is sincerely held. *See id.* Father is Rastafarian and claims that the tenets of that religion prohibit him from obtaining a psychological evaluation. The district court did not question the sincerity of father's belief, and mother does not dispute the sincerity of father's belief on appeal. The record supports a determination that father's belief is sincerely held.

Under the second prong of the *Hill-Murray* test, we must determine whether Minnesota Statutes section 518.131, subdivision 1, as applied to father, burdened the exercise of his religious belief. *See id.* The district court informed father that "his refusal to comply with the directive to complete a psychological evaluation would result in the Court drawing negative inferences as to his mental health—which the Court [did draw]." Father argues that the district court's application of Minnesota Statutes section 518.131,

8

subdivision 1, unconstitutionally burdened the exercise of his beliefs by forcing him to violate a tenet of his religion by undergoing a psychological evaluation or suffer a restriction of his parenting time with J.J.I.A.

"[T]hose challenging the application of a law have the burden of establishing that challenged provisions infringe on their religious autonomy or require conduct inconsistent with their religious beliefs." *Edina Cmty. Lutheran Church v. State*, 745 N.W.2d 194, 204 (Minn. App. 2008), *review denied* (Minn. Apr. 29, 2008). "To constitute such a burden, the challengers must establish that the risk of interference with religious beliefs or practice is real and not remote." *Id.* (quotation omitted). We turn to caselaw for guidance in analyzing father's argument. Based on the facts in this case, we conclude that the burden placed on father was real and not remote, potentially interfering with his father-child relationship. *See Murphy v. Murphy*, 574 N.W.2d 77, 81 (Minn. App. 1998) (stating in child-support case that "ordering [Amish parent] to pay a support obligation that he will be unable to pay without taking a secular job will impose on his exercise of religious beliefs or cause him to risk penalties for nonpayment of support"); *cf. In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 133 (Minn. 2014) (recognizing "fundamental liberty interest of natural parents in the care, custody, and management of their child" (quotation omitted)).

Under the third prong of the *Hill-Murray* test, we must determine whether the state's interest in father undergoing the court-ordered psychological evaluation is overriding and compelling. *See* 487 N.W.2d at 865. The government has a compelling interest in "safeguarding the physical and psychological well-being of children." *R.D.L.*,

9

853 N.W.2d at 134 (quotation omitted). That compelling interest applies in proceedings over custody and parenting time. *State ex rel. Flint v. Flint*, 63 Minn. 187, 189, 65 N.W. 272, 273 (1895) (stating, in custody proceeding, that "the primary object of all courts, at least in America, is to secure the welfare of the child, and not the special claims of one or the other parent"); *Geske v. Marcolina*, 642 N.W.2d 62, 68 (Minn. App. 2002) (recognizing, in parenting-time proceeding, that state has compelling interest in children's best interests).

Father argues that the state's interest is not compelling in this case "because of the specific circumstances and facts in this matter." Father first emphasizes that the district court made the negative inference regarding his mental health "nearly two and one-half years after the initiation of the case." Father argues that, during that time, the court "had the ability to take testimony of [father] on numerous occasions, take testimony of witnesses, and otherwise observe [father] throughout the proceedings." He summarizes his state's-interest arguments as follows:

> From a timeline standpoint, the case went on for over two years before the Court took a negative inference regarding [father]'s mental health. Additionally, [father] worked with the [GAL] extensively that allowed the Court to get input and feedback as to [father]'s mental fitness to parent. Finally, the District Court awarded custody of the two older children to [father] without [father]'s submission to the psychological test.

We are not persuaded by father's arguments that the state's interest is not compelling in this case. Father fails to mention the district court's findings about its concerns regarding

father's courtroom demeanor, father's mental health and fitness to parent, and the GAL's concerns about father's mental health. The GAL testified as follows:

> I'm concerned that [father] has not followed the order of the court to address—to seek a parenting assessment and psychological evaluation. I'm concerned that potential unmet mental health needs by [father] may be a part of that desire to negatively influence the children towards their mother.
>
> . . . .
>
> When I spoke with [J.J.-I.A.] about his religious beliefs, he said he didn't really know too much about it, but that it was about not talking to therapists or social workers—I don't remember the exact word that he used—and about smoking weed. He said he knew that was the case because that was what [father] told him.

Minnesota courts have rejected many constitutional challenges to the state's efforts to safeguard the physical and psychological well-being of children. *See, e.g.*, *In re Welfare of J.W.*, 391 N.W.2d 791, 792–93, 795 (Minn. 1986) (rejecting argument that sanctions violated parents' rights to due process where "[t]he safety and well-being of [the children we]re at issue"); *Geske*, 642 N.W.2d at 68, 70 (rejecting First Amendment challenge to injunction against publication of pictures of children, reasoning we "ha[ve] previously justified infringements of other fundamental rights by finding the best interests of the children to be a compelling state interest"). Here, the record contains substantial evidence that supports the district court's findings regarding its concern and the GAL's concern about father's abusive treatment of mother and his successful, ongoing efforts to alienate the children from mother. On one occasion, father forced mother to be present with the children while he disparaged her and blamed her for the

11

family's problems. As for the district court's adoption of the parties' stipulation that father would have physical custody of the two older children, the record reflects that the older children refused to remain in mother's care as a result of father's successful alienation efforts. The court made findings about the alienation and about its concerns regarding the unmet behavioral and mental-health needs of the older children and father's mental health and fitness to parent. The record amply supports these findings. Father's argument that the state has no compelling interest in protecting the best interests of the children in this case is entirely inconsistent with the court's findings.

The fourth prong is whether the state regulation uses the least-restrictive means. *Hill-Murray*, 487 N.W.2d at 865. "In the event it is possible to achieve [the state's] compelling interests through less restrictive, alternative means, article I, section 16 dictates the use of that alternative." *Id.* at 867 (citing *Hershberger*, 462 N.W.2d at 399).

Father argues that the state has not used the least-restrictive means available to verify his mental capacity to parent J.J.I.A. He states that his counsel requested of the district court alternatives to psychological evaluations, referencing a hearing on August 2, 2011. On that date, the following colloquy occurred:

> THE COURT: Counsel, any questions? Mr. Fish?
> FATHER'S COUNSEL: The only [question] I would have would be just with regard to the requirements for my client regarding psychological evaluation and the coparenting time class, unfortunately, I did not do the research beforehand, but would the court be open to any type of alternative, knowing that before I even speak with my client, there will be hesitations in participation, but wanting to comply with the court order. Are there other options that the court would be available to if I were to find some options?

12

> THE COURT: You will have time between now and Friday to talk with [father]. I'll take up your question on Friday. I'll meet with counsel in chambers and we'll talk about that matter on Friday.
>
> . . . .
>
> THE COURT: . . . Yes, I am open to what you might have to suggest. Yes.

Neither father's brief nor the record informs us about what information, if any, father or his counsel provided the court soon after that hearing. Instead, the brief next references a hearing on March 8, 2013, at which father claims that "Counsel for [father] went on to list the other options available for determining [father]'s fitness to parent, including having others meet with [father], and/or the children, to witness [father]'s capacity to parent." Father specifically cites the following statements by his counsel at that hearing:

> FATHER'S COUNSEL: There are other members of the community that aren't of the mental health sciences that can come and talk with [father] and witness the family to have those types of discussions without having to do a full psychological evaluation.

But, at the hearing, father did not provide the district court with any specific less-restrictive alternatives to a psychological evaluation, and father never has provided names of the "other members of the community" that his counsel mentioned at the hearing on March 8, 2013. Indeed, father never has identified any specific less-restrictive alternative to a psychological evaluation.

Father next discusses in his brief his direct testimony at a hearing on June 20, 2013, at which his counsel asked him whether he would be "willing to participate in a coparenting class." Father answered, "Only if a Rastafarian runs it." Father concludes his argument that less-restrictive means are available by stating that "[t]here are a variety of

13

ways to determine a parent's mental fitness to raise their child, none of which were explored by the State in determining [father]'s mental fitness, despite [father]'s request." Father's vague and conclusory argument regarding the existence of available less-restrictive alternatives by which the district court could verify his mental capacity to parent J.J.I.A. is neither helpful nor persuasive.

The district court neither embraced father's suggested alternatives nor discussed them. Based on the record before us, we conclude that none of father's vague alternatives for verification of his mental health and fitness to parent was a viable less-restrictive means to accomplish the state's compelling interest in protecting the children.

Both the legislature and the judiciary have recognized the importance of considering a parent's mental health to ensure that a child's best interests are served. *See* Minn. Stat. § 518.17, subd. 1(a) (providing that, in custody proceedings, courts must make findings on child's best interests including "the mental . . . health of all individuals involved"); *In re Welfare of Kidd*, 261 N.W.2d 833, 836 (Minn. 1978) (affirming termination of parental rights where mother's conduct stemming from mental illness was likely to be detrimental to physical and mental health of child); *McCabe v. McCabe*, 430 N.W.2d 870, 873–74 (Minn. App. 1988) (affirming custody determination predicated in part on mother's mental health), *review denied* (Minn. Dec. 30, 1988); *Sinsabaugh v. Heinerscheid*, 428 N.W.2d 476, 477, 479–81 (Minn. App. 1988) (affirming custody determination where district court considered, among other things, that appellant "suffered from serious depression and anxiety"). Here, the district court found that "[father]'s behavior has created clear and unambiguous concern about his mental health."

14

The record supports this finding, and we therefore conclude that Minnesota Statutes section 518.131, subdivision 1, as applied, does not impermissibly violate father's constitutional freedom of conscience.

## III.     The district court did not abuse its discretion in establishing father's parenting time with J.J.I.A.

"[U]pon the request of either parent," a district court shall "grant such parenting time . . . as will enable the child and the parent to maintain a child to parent relationship that will be in the best interests of the child." Minn. Stat. § 518.175, subd. 1(a). "In the absence of other evidence, there is a rebuttable presumption that a parent is entitled to receive at least 25 percent of the parenting time for the child." *Id.*, subd. 1(g) (2014). But "[parenting-time] rights are not absolute and are to be exercised only when in the best interest of the child." *Manthei v. Manthei*, 268 N.W.2d 45, 45 (Minn. 1978).

> If the court finds, after a hearing, that parenting time with a parent is likely to endanger the child's physical or emotional health or impair the child's emotional development, the court shall restrict parenting time with that parent as to time, place, duration, or supervision and may deny parenting time entirely, as the circumstances warrant.

Minn. Stat. § 518.175, subd. 1(b); *accord Al-Zouhayli v. Al-Zouhayli*, 486 N.W.2d 10, 12 (Minn. App. 1992). "Appellate courts recognize that a district court has broad discretion to decide parenting-time questions, and will not reverse a parenting-time decision unless the district court abused its discretion by misapplying the law or by relying on findings of fact that are not supported by the record." *Suleski v. Rupe*, 855 N.W.2d 330, 334 (Minn. App. 2014) (citations omitted). "A district court's findings of fact underlying a parenting-

time decision will be upheld unless they are clearly erroneous." *Dahl v. Dahl*, 765 N.W.2d 118, 123 (Minn. App. 2009).

Father argues that the district court failed to make sufficient and accurate best-interests findings under Minn. Stat. § 518.17, subd. 1(a), to warrant a restriction of his parenting time with J.J.I.A. But the plain language of Minn. Stat. § 518.175, subd. 1, does not require the court to make findings regarding the best-interests factors in Minn. Stat. § 518.17, subd. 1(a), which addresses custody, rather than parenting time. The parenting-time statute requires only that the court "grant such parenting time . . . as will enable the child and the parent to maintain a child to parent relationship that will be in the best interests of the child," and allows for restrictions on parenting time when "the court finds . . . that parenting time with a parent is likely to endanger the child's physical or emotional health or impair the child's emotional development." Minn. Stat. § 518.175, subd. 1(a), (b).

Here, the district court found that the best interests of J.J.I.A. require an examination of father's mental health "before his parenting time with [J.J.I.A.] can be seen as safe without supervision." The court also found that "[J.J.I.A.]'s welfare necessitates parenting time in a closely supervised setting to protect [him] from [father]'s campaign of alienation." This finding was predicated on other findings regarding father's successful efforts to alienate the two older children from mother. Denial of access to a parent and efforts to paint a parent in a poor light have the potential to endanger a child's emotional health or impair his emotional development. *Cf. Grein v. Grein*, 364 N.W.2d 383, 385–86 (Minn. 1985) (affirming custody modification, stating that "[w]ithout doubt,

16

. . . the trial court relied heavily on appellant's persistent interference with visitation rights, and, in our view, rightfully so," reasoning in part that "[t]he court . . . took note of appellant's continued suspicious and accusatory nature which may have an adverse effect on the child and his relationship with his father"); *Clark v. Bullard*, 396 N.W.2d 41, 44 (Minn. App. 1986) ("[T]he child was harmed by being denied visitation with his father for six months."); *Meier v. Connelly*, 378 N.W.2d 812, 816 (Minn. App. 1985) (upholding finding of endangerment where witness testified that "to deprive a child of access of a parent . . . is detrimental to the child" (quotation marks omitted)). We conclude that the court's finding regarding likely endangerment to J.J.I.A.'s emotional health or impairment to his emotional development was not clearly erroneous.

Moreover, the district court made numerous other findings relevant to J.J.I.A.'s best interests, including those pertaining to mother's role as J.J.I.A.'s primary caregiver during much of his life; the history of domestic abuse perpetrated by father against mother; father's opposition to mental-health services and concerns about his mental health; and J.J.I.A.'s success in school and therapy attendance while in mother's care. The court's findings demonstrate a reasoned balance between enabling a parental bond between J.J.I.A. and father and protecting J.J.I.A. from the emotional harm likely to result from unsupervised parenting time with father. We conclude that the court did not abuse its discretion by restricting father's parenting time.

**IV. The district court did not abuse its discretion by finding that mother was not in constructive civil contempt of court.**

"Civil contempt . . . is failing to obey a court order in favor of the opposing party in a civil proceeding." *Minn. State Bar Ass'n v. Divorce Assistance Ass'n, Inc.*, 311 Minn. 276, 285, 248 N.W.2d 733, 741 (1976). "Constructive contempts are those not committed in the immediate presence of the court, and of which it has no personal knowledge . . . ." Minn. Stat. § 588.01, subd. 3 (2014).

"Th[e contempt] power gives the trial court inherently broad discretion to hold an individual in contempt but only where the contemnor has acted 'contumaciously, in bad faith, and out of disrespect for the judicial process.'" *Erickson v. Erickson*, 385 N.W.2d 301, 304 (Minn. 1986) (quoting *Minn. State Bar Ass'n*, 311 Minn. at 284, 248 N.W.2d at 740). "In exercising civil contempt powers . . . , the only objective is to secure compliance with an order presumed to be reasonable." *Hopp v. Hopp*, 279 Minn. 170, 173, 156 N.W.2d 212, 216 (1968); *see also Zaldivar v. Rodriguez*, 819 N.W.2d 187, 196 (Minn. App. 2012) ("The purpose of civil contempt proceedings is to induce future performance of a valid court order, not to punish for past failure to perform." (quotation omitted)). The supreme court has characterized contempt as an "extreme remedy," *Hampton v. Hampton*, 303 Minn. 500, 502, 229 N.W.2d 139, 140 (1975), and this court has instructed that civil contempt powers "must be exercised with caution," *Burgardt v. Burgardt*, 474 N.W.2d 235, 236 (Minn. App. 1991). "The district court's decision to invoke its contempt powers is subject to reversal for abuse of discretion." *In re Welfare of Children of J.B.*, 782 N.W.2d 535, 538 (Minn. 2010).

18

Father argues that mother was in constructive civil contempt by denying him parenting time over the 2012 Father's Day weekend, in violation of a May 2011 order providing that "[he] shall have parenting time with the minor children every Saturday from 9:00 a.m. to Sunday at 5:00 p.m." Mother testified that father's counsel gave her counsel approval for her to take the children on vacation as long as father received extra parenting time. After she received approval from counsel and made plans for the vacation, father "changed his mind." Mother submitted an affidavit in which she claimed that "[father] stated . . . [she] was not to listen to his attorney." This evidence supports the district court's finding that the parenting-time dispute "was the result of miscommunication and misunderstanding between the parties, through their attorneys." Furthermore, even if mother's action was a violation of the May 2011 order, the evidence presented indicates that it was not done "contumaciously, in bad faith, and out of disrespect for the judicial process." *Minn. State Bar Ass'n*, 311 Minn. at 284, 248 N.W.2d at 740.

Father also argues that mother was in constructive civil contempt for attempting to limit his access to information about the children in violation of an order in which the district court denied mother's motion to prohibit father from accessing information about J.J.-I.A.'s juvenile delinquency proceeding.

> In addressing the limits on a trial judge's exercise of civil contempt powers, [the supreme court has] stated that one essential prerequisite is that the prior decree or order of a court sought to be enforced by contempt must clearly define the acts to be performed by the alleged contemnor.

*Mr. Steak, Inc. v. Sandquist Steaks, Inc.*, 309 Minn. 408, 411, 245 N.W.2d 837, 838 (1976). The supreme court has indicated that an order is not "a sufficient basis for constructive civil contempt proceedings" if it does not impose "express commands or prohibitions" upon the alleged contemnor. *Id.*

Here, the order that denied mother's motion to prohibit father from accessing information about J.J.-I.A.'s juvenile delinquency proceeding did not impose any express commands or prohibitions upon mother. The order therefore was not a sufficient basis for constructive civil contempt proceedings. The district court did not abuse its discretion by declining to find mother in constructive civil contempt of court.

## D E C I S I O N

The district court's application of Minnesota Statutes section 518.131, subdivision 1, in ordering father to obtain a psychological evaluation did not violate father's freedom of conscience. The court did not clearly err by imputing income to father and not imputing income to mother. The court was not required to make best-interest findings under Minn. Stat. § 518.17, subd. 1(a), before restricting father's parenting time under Minn. Stat. § 518.175, subd. 1(a), (b), and did not err by restricting his parenting time. The court did not err by declining to find mother in constructive civil contempt of court.

**Affirmed.**