*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014)*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0942**

In re the Marriage of:

Kathleen Jean Rucker, petitioner,
Respondent,

vs.

Kraig Vernon Rucker,
Appellant.

**Filed December 27, 2016
Affirmed in part, reversed in part, and remanded
Smith, Tracy M., Judge**

Olmsted County District Court
File No. 55-FA-14-5800

Jill I. Frieders, O'Brien & Wolf, L.L.P., Rochester, Minnesota (for respondent)

Kay Nord Hunt, Lommen Abdo, P.A., Minneapolis, Minnesota; and Marilyn J. Michales, Michales Family Law, Eden Prairie, Minnesota (for appellant)

        Considered and decided by Reyes, Presiding Judge; Smith, Tracy M., Judge; and

Smith, John, Judge.*

_____

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**SMITH, TRACY M.**, Judge

Appellant-husband Kraig Rucker challenges an Olmsted County District Court's judgment in the marriage-dissolution proceeding between appellant and respondent-wife Kathleen Rucker. Appellant argues on appeal that the district court (1) abused its discretion by granting sole physical and sole legal custody of the parties' children to respondent and limiting his parenting time; (2) abused its discretion by denying appellant a downward deviation from the presumptively appropriate guideline child-support obligation; (3) abused its discretion by denying appellant spousal maintenance; (4) abused its discretion by denying appellant's nonmarital-property claim; and (5) erred in construing an in vitro fertilization consent form to award respondent the parties' cryopreserved embryos. We conclude that the district court did not abuse its discretion as alleged by appellant in his arguments (1)-(4). With respect to argument (5), because we conclude that the district court erred in interpreting the consent form, we reverse and remand. We therefore affirm in part, reverse in part, and remand.

## FACTS

Appellant and respondent married in August 1998. They have two children, G.R. and M.R, ages 13 and 6 at the time of dissolution. Respondent filed a petition for dissolution of marriage in August 2014. The parties physically separated in September 2014 when respondent moved out of the marital home.

When respondent left the marital home, she transferred the parties' money, including money appellant had inherited from his father, from a marital joint bank account

into her personal bank account. At trial, appellant's financial expert testified that appellant had $35,379 in nonmarital funds in the joint bank account on August 1, 2014. Respondent testified that she used the withdrawn funds to pay the parties' mortgage, property taxes, home loan, and other marital expenses. Financial records show that from August 1, 2014, to the valuation date of June 2, 2015, money was transferred between the joint bank account and respondent's individual account on multiple occasions. Both parties continued to deposit paychecks in the joint bank account until respondent switched to using a personal bank account and, eventually, closed the joint bank account.

During the pendency of the proceeding, the parties shared custody of their children. Respondent requested sole physical and sole legal custody of G.R. and M.R. Appellant requested joint physical and joint legal custody and a 50/50 parenting-time arrangement. The district court ordered a neutral custody evaluation. In her report, the custody evaluator expressed concerns that appellant's negative behavior toward respondent in front of the children would result in the children becoming alienated from respondent. The evaluator recommended that respondent be granted sole legal and sole physical custody.

Both appellant and respondent, as well as G.R. and M.R., began attending counseling after the separation. Appellant was unable to participate in therapy sessions with respondent and her therapist because he "verbally exploded and then left [the therapist's] office." Concerned about respondent's safety, her therapist advised her to "go to a Women's Shelter for that evening and not go home." Counselors who worked with appellant and respondent believed that appellant was unaware of his "controlling" behavior

3

and observed that he failed to cooperate in therapy sessions. Both children's therapists found the children "unusually" aligned with appellant.

Since the separation, appellant has been a "negative influence" on the children. Appellant used the children as "spies in [respondent's] home." Appellant used phone calls with the children to sing songs about lost love to the children while they were with respondent. Appellant told the children that divorce is a sin and people who get divorced go to hell. According to the custody evaluator, appellant's actions have caused the children to "internalize[] their father's perspective and beliefs, and see their mother as the cause of their father's sadness and anger. Consequently the children are rejecting of their mother and most things associated with her."

During the pendency of the proceeding, appellant began harassing respondent by phone; text message; and Our Family Wizard, a phone application designed to help estranged parents communicate about their children. Respondent obtained a harassment restraining order against appellant in December 2014. The district court found that appellant had stalked respondent; gone to her home uninvited; harassed her by phone, text, e-mail, and Our Family Wizard multiple times a day; and made her feel threatened.

Following six days of trial, the district court issued its findings of fact, conclusions of law, order for judgment, and judgment and decree in February 2016. With respect to child custody, the district court analyzed the 12 best-interests factors under Minn. Stat. § 518.17 (Supp. 2015), and at the end of each discussion noted whether the factor weighed in favor of appellant or respondent or was "neutral." The district court granted respondent sole physical and sole legal custody of the children. The district court limited appellant's

4

parenting time to every other weekend and every Thursday evening, with additional parenting time in the summer, for vacation, and on holidays.

For purposes of child support and spousal maintenance, the district court found that respondent has a gross monthly income of $5,315.83 and a claimed monthly budget of $5,636.67. The court found that appellant has a gross monthly income of $5,764.03 and a claimed monthly budget of $6,483.55, but his "reasonable expenses do not exceed $3,000" after the payment of child support and taxes. The court awarded respondent $1,335 in child support, including daycare and insurance expenses, and denied appellant's request for spousal maintenance. The district court also concluded that appellant failed to establish that respondent owed him $35,379 in nonmarital property based on her transfer of funds from their joint bank account to her personal bank account. Furthermore, the court concluded that there was no credible evidence indicating that respondent had done anything impermissible with the funds from the joint bank account because the funds had been used to pay marital expenses.

Finally, the district court awarded respondent the parties' two cryopreserved embryos, which have been stored at Mayo Clinic since May 2008. The district court concluded that the Mayo Clinic consent form signed by both appellant and respondent is a binding contract that controls the disposition of the embryos and interpreted the language of the consent form to assign the property rights to the embryos to respondent in the event of divorce.

Appellant filed a posttrial motion arguing that the district court did not properly weigh the best interests of the children, should have awarded appellant spousal

5

maintenance and granted a downward deviation from the presumptively appropriate child-support obligation, and misconstrued the in vitro fertilization consent form. The district court rejected all of appellant's arguments but stayed the disposition of the embryos.

This appeal follows.

## D E C I S I O N

**I.    The district court did not abuse its discretion by granting respondent sole physical and sole legal custody of the children and limiting appellant's parenting time.**

Appellant argues that the district court abused its discretion by granting respondent sole physical and sole legal custody of their children and limiting his parenting time. We review the district court's custody and parenting-time determinations for "whether the [district] court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn. 1985); *see Hagens v. Schirmers*, 783 N.W.2d 212, 215 (Minn. App. 2010). The law "leaves scant if any room for an appellate court to question the [district] court's balancing of best-interests considerations." *Vangsness v. Vangsness*, 607 N.W.2d 468, 477 (Minn. App. 2000). We sustain a district court's findings of fact unless they are clearly erroneous. *Pikula*, 374 N.W.2d at 710. We also defer to a district court's credibility determinations. *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988).

The best interests of the child are central to determining issues of physical and legal custody and parenting time. Minn. Stat. § 518.17, subd. 1(a). Minn. Stat. § 518.17, subd. 1(a)(1)-(12), lists 12 factors to be considered in evaluating the best interests of the child. *Id.* The statute requires the district court to make "detailed" factual findings for each factor,

6

explaining how each factor led to its conclusion, and prohibits the court from using "one factor to the exclusion of all others." *Id.*, subd. 1(b)(1). The statute also requires the use of a rebuttable presumption that joint legal custody is in the best interests of a child if joint legal custody is requested by a parent. *Id.*, subd. 1(b)(9). The statute, however, provides for no presumption regarding joint physical custody. *See id.*, subd. 1(b)(7).[1]

### A. The district court did not abuse its discretion by making shorthand summaries of its findings.

Appellant argues that the district court abused its discretion by failing to comply with the child-centered analysis required by section 518.17 because it was inappropriate for the district court to indicate whether each factor weighed in favor of appellant or respondent or was neutral. Appellant contends that the district court conducted a parent-centered analysis and that the district court's conclusions failed to take into account the presumption that joint legal custody is in the best interests of the children.

The statute requires the district court to

> make detailed findings on each of the factors in paragraph (a) based on the evidence presented and explain how each factor led to its conclusions and to the determination of custody and parenting time. The court may not use one factor to the exclusion of all others, and the court shall consider that the factors may be interrelated.

Minn. Stat. § 518.17, subd. 1(b)(1). The district court's analysis of the best-interests factors, which used a shorthand to indicate that a factor favored "Father" or "Mother" or

---

[1] The statute establishes a presumption against joint legal and joint physical custody in the case of domestic abuse, which is not an issue in this case. Minn. Stat. § 518.17, subd. 1(b)(9).

7

was "neutral," is not inconsistent with the statute. *See id.*, subd. 1(a)(1)-(12). The district court wrote 32 pages of factual findings on child custody, thoroughly weighed the evidence, and explained how this evidence led to its conclusions. Read in its entirety, the district court's analysis is child centered and explains why the court decided that joint legal and joint physical custody are not in the best interests of the children. The district court did not abuse its discretion by making its shorthand summaries because the district court complied with the statute by making thorough findings of fact and explaining how these findings led to its conclusions. *See id.*, subd. 1(b)(1).

**B. The district court did not abuse its discretion by granting respondent sole physical custody and limiting appellant's parenting time.**

Appellant argues that the district court abused its discretion by granting respondent sole physical custody of the children and limiting his parenting time.

The district court found that the factors related to the children's physical, emotional, cultural, spiritual, and other needs; the children's special medical, mental-health, or educational needs; any physical, mental, or chemical-health issue of a parent that affects the child's safety or developmental needs; the willingness and ability of each parent to provide ongoing care and meet the children's ongoing needs; the effect of the proposed custodial arrangement on the children's ongoing relationships; the benefit to the children of maximizing parenting time with both parents and the detriment of limiting time with either parent; the disposition of each parent to support the child's relationship with the other parent; and the willingness and ability of the parents to cooperate in rearing the child each weighed in favor of respondent. *See id.*, subd. 1(a)(1)-(2), (5), (7), (9)-(12). The

district court found that the factor related to the effect on the children's well-being of changes to the home, school, and community weighed in favor of appellant. *See id.*, subd. 1(a)(8). Finally, the district court found that the remaining factors were neutral and did not weigh in favor of either party. *See id.*, subd. 1(a)(3)-(4), (6).

Regardless of appellant's complaints about the district court's shorthand for summarizing its findings, the district court fully explained its best-interest findings, and substantial evidence supports the findings. Early in the separation, respondent obtained a harassment restraining order against appellant. The record shows that appellant was unable to participate in therapy sessions with respondent's therapist because he "verbally exploded and then left [the therapist's] office." The record also shows that multiple counselors who worked with appellant and respondent believed appellant was unaware of his "controlling" behavior and failed to cooperate in therapy sessions.

The district court found that appellant "places the children in the middle of adult issues" and attempts to undermine the children's relationship with respondent. Both of the children's therapists found them "unusually" aligned with appellant. The record demonstrates that appellant used G.R. to obtain information about respondent. For example, he sent text messages to respondent, stating, "[G.R.] will keep me posted on any plans you may be making as far as vacations so deception will not be an option any longer." The record also shows that appellant competed with respondent in parenting the children. For example, appellant messaged respondent that he would ensure the Tooth Fairy "make[s] a second stop at the place she does call home" and would ensure "this visit trumps all previous ones and makes a lasting impression." Appellant used phone calls to sing

9

inappropriate songs to the children while they were with respondent. Appellant told the children that divorce was a sin, and that people who get divorced go to hell, and he prayed with the children for respondent to return to the marriage. The independent custody evaluator expressed concerns that appellant's negative behavior would result in the children becoming alienated from respondent.

In *Henrikson v. Henrikson*, the Minnesota Supreme Court held that the "voluminous record of testimony and exhibits" supported the district court's conclusion that "a change of custody was necessary to thwart a manifest purpose of plaintiff and her present husband to alienate the children from the affection and influence of their father." 288 Minn. 532, 533, 179 N.W.2d 284, 285 (1970). While this case involves an initial grant of custody, we believe that the circumstances of this case are sufficiently analogous to *Henrikson* that *Henrikson* can provide guidance here. *Id.* In particular, here, the district court found that appellant "is unable to allow the children, especially [G.R.,] to love both parents without guilt or disapproval."

The district court did not abuse its discretion by granting sole physical custody to respondent and limiting appellant's parenting time because substantial evidence supports its best-interests findings.[2] *See* Minn. Stat. § 518.17, subd. 1(a)(1)-(12).

---

[2] Usually, custody and parenting time involve separate analyses under separate statutes. *See* Minn. Stat. § 518.17 (describing the custody analysis); Minn. Stat. § 518.175 (Supp. 2015) (describing the parenting-time analysis). Appellant consolidated these issues into a single argument, focusing on the child-custody issue. Appellant has argued neither that his parenting time is being "restricted" nor that he was not granted the presumptively appropriate 25% parenting time. Minn. Stat. § 518.17, subd. 1(b), (g).

**C. The district court did not abuse its discretion by granting respondent sole legal custody.**

Appellant challenges the district court's determination that respondent had produced sufficient evidence to rebut the presumption that joint legal custody is in the best interests of the children. The district court stated that it used the rebuttable presumption in evaluating whether joint legal custody is in the best interests of the children but ultimately granted sole legal custody to respondent.

Section 518.003 defines "[j]oint legal custody" to mean "both parents have equal rights and responsibilities, including the right to participate in major decisions determining the child's upbringing, including education, health care, and religious training." Minn. Stat. § 518.003, subd. 3(b) (2014). When one parent has requested joint legal custody, section 518.17 instructs the district court to use a rebuttable presumption that joint legal custody is in the best interests of the child. Minn. Stat. § 518.17, subd. 1(b)(9).

We have held that joint legal custody is inappropriate where "the evidence indicates that the parties lack the ability to cooperate and communicate." *Wopata v. Wopata*, 498 N.W.2d 478, 482 (Minn. App. 1993). In *Wopata*, we reversed a district court's decision to grant joint legal custody where the parties were unable to cooperate and each "use[d] the children as a weapon against the other." *Id.* In *Digatono v. Digatono*, we concluded that the district court did not abuse its discretion by denying joint legal custody where the parties' relationship was "intense" and "any significant contact between the parties [was] likely to result in further tension, and may in fact result in physical confrontations." 414 N.W.2d 498, 502 (Minn. App. 1987), *review denied* (Minn. Jan. 15,

11

1988).  In *Heard v. Heard*, we reversed the district court's decision to grant joint legal custody where "negotiations even on such matters as telephone calls by the children sometimes resulted in abusive behavior."  353 N.W.2d 157, 161-62 (Minn. App. 1984).

The district court's grant of sole legal custody to respondent is supported by substantial evidence that respondent and appellant lack the ability to cooperate on a level that would permit joint legal custody.  The facts of this case are analogous to those in *Wopata*, *Digatono*, and *Heard* because appellant is unable to communicate with respondent without becoming upset over their relationship and additional communication is likely to result in further tension between the parties.  While not necessarily dispositive on the subject, we note that appellant's behavior toward respondent even led to a harassment restraining order against appellant.

Appellant contends that both parents have agreed on and participated in the children's "education, health care, and religious training" and therefore the court had no basis for ruling that the presumption had been overcome.  The statute lists the children's "physical, emotional, cultural, spiritual, and other needs" as relevant in determining their best interests.  Minn. Stat. § 518.17, subd. 1(a)(1).  The district court, however, "may not use one factor to the exclusion of all others, and the court shall consider that the factors may be interrelated."  *Id.*, subd. 1(b)(1).  While the district court found that both parties are able to address the children's needs in these areas, it also found that appellant "fails to have meaningful insight into his behavior and negative impact upon [the] children."  Appellant presents no caselaw in which the parents' current agreement on the children's education, health care, and religious training was enough to require joint legal custody where the

parents were otherwise unable to cooperate. We affirm the district court's determination that respondent presented sufficient evidence to rebut the presumption of joint legal custody and its granting of sole legal custody to respondent. *Id.*

## II. The district court did not abuse its discretion by denying appellant a downward deviation from the presumptively appropriate guideline child-support obligation.

Appellant argues that the district court abused its discretion by failing to grant him a downward deviation from the presumptively appropriate guideline child-support obligation. He asserts that he cannot meet his reasonable monthly expenses. The district court found that appellant is capable of "being self-supporting" and that his reasonable expenses after child support and taxes "do not exceed $3,000 per month." The district court concluded that, under the child-support guidelines, appellant's presumptively appropriate guideline basic support obligation is $1,042 per month and ordered him to pay that amount plus childcare support and medical support, for a total of $1,335 per month.

This court reviews the calculation of child support for an abuse of discretion. *Rutten v. Rutten*, 347 N.W.2d 47, 50 (Minn. 1984). The district court has broad discretion in awarding child support, and this court will reverse the district court only if it is convinced that the district court resolved the matter in a manner "against logic and the facts on record." *Putz v. Putz*, 645 N.W.2d 343, 347 (Minn. 2002). This court reviews a district court's determination of the parties' incomes and budgets for clear error. *Newstrand v. Arend*, 869 N.W.2d 681, 685 (Minn. App. 2015), *review denied* (Minn. Dec. 15, 2015).

The parents' gross income is only the starting point for the child-support analysis. *Haefele v. Haefele*, 837 N.W.2d 703, 714 (Minn. 2013). The party who requests a deviation

from the child-support guidelines bears the burden of producing evidence "that would merit a deviation." *Bunge v. Zachman*, 578 N.W.2d 387, 390 (Minn. App. 1998), *review denied* (Minn. July 30, 1998). In considering whether to deviate from the child-support guidelines, the statute lists a number of factors for consideration:

> (1)  all earnings, income, circumstances, and resources of each parent, including real and personal property . . . ;
> (2)  the extraordinary financial needs and resources, physical and emotional condition, and educational needs of the child to be supported;
> (3)  the standard of living the child would enjoy if the parents were currently living together, but recognizing that the parents now have separate households . . . ;
> (6)  the parents' debts as provided in subdivision 2 . . . .

Minn. Stat. § 518A.43, subd. 1 (Supp. 2015). In order to deviate from the statutory guidelines, the district court must make written findings articulating, among other things, "how the deviation serves the best interests of the child." Minn. Stat. § 518A.37, subd. 2(5) (2014).

We conclude that the district court did not abuse its discretion by denying appellant's request for a downward deviation in child support. While the district court listed appellant's claimed monthly budget of $6,483.55 in its findings, the district court nevertheless found that appellant's reasonable expenses do not exceed $3,000 after taxes and child support. The district court did not explain its departure from appellant's budget, but appellant has not shown that the district court's calculations are so clearly erroneous as to warrant reversal. *See Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) ("Findings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." (quotation omitted)).

14

Appellant's financial expert testified that appellant's budget would be lower without joint custody. The district court found that both parties are able to reduce their expenses and "will need to budget like most couples after a dissolution." The district court also found that appellant earns more than respondent and respondent will be supporting two children. With child support, respondent could meet her new budget, which the district court implicitly found is in the best interests of the children.

The district court therefore did not abuse its discretion by denying appellant a downward deviation in child support. *Putz*, 645 N.W.2d at 347.

III. **The district court did not abuse its discretion by denying appellant spousal maintenance.**

Appellant argues that the district court abused its discretion by failing to award him spousal maintenance to offset his child-support obligations. We review the decision to grant or deny spousal maintenance for an abuse of discretion. *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997). A district court abuses it discretion if its findings of fact are unsupported by the record or if it improperly applies the law. *Id.* Factual findings concerning spousal maintenance are upheld unless they are clearly erroneous. *Gessner v. Gessner*, 487 N.W.2d 921, 923 (Minn. App. 1992). The determination of income for maintenance purposes is a finding of fact and is not set aside unless clearly erroneous. *Peterka v. Peterka*, 675 N.W.2d 353, 357 (Minn. App. 2004).

A district court may award spousal maintenance upon finding that the party seeking maintenance "lacks sufficient property . . . to provide for reasonable needs of the spouse considering the standard of living established during the marriage" or "is unable to provide

adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment." Minn. Stat. § 518.552, subd. 1(a)-(b) (2014). The district court concluded that there is no statutory basis to award appellant spousal maintenance.

We conclude that the district court did not abuse its discretion by denying appellant spousal maintenance. The district court determined that both parties "earn approximately $5000 gross income per month" and "lived a moderate life style," and that appellant has "the ability to meet his own needs independently and has sufficient education and training for appropriate employment" to adequately support himself. Minn. Stat. § 518.552, subd. 1(b). Even appellant's financial expert testified, "[I]n many cases when you have households that are splitting, the expenses may be more than what the available income is." Appellant is also not the custodian of a child "whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home." *Id*. No statutory ground supports appellant's request for spousal maintenance.

Moreover, if the district court believed appellant could not meet his child-support obligations, it could deviate from the child-support guidelines—not award appellant spousal maintenance to enable him to pay child support. Minn. Stat. § 518A.43, subd. 1.

We therefore conclude that the district court did not abuse its discretion by denying appellant spousal maintenance. Minn. Stat. § 518.552, subd. 1(a)-(b).

16

**IV. The district court did not abuse its discretion by rejecting appellant's nonmarital property claim.**

Appellant argues that the district court erred by failing to reduce respondent's share of the property equalizer by $35,379 for appellant's nonmarital property that respondent transferred to her personal bank account after the parties' separation. The district court concluded that appellant failed to prove his nonmarital claim and that no credible evidence shows that respondent used these funds for inappropriate purposes.

We evaluate the division of property for an abuse of discretion. *Antone v. Antone*, 645 N.W.2d 96, 100 (Minn. 2002). "Whether property is marital or nonmarital is a question of law, but a reviewing court must defer to the [district] court's underlying findings of fact." *Olsen v. Olsen*, 562 N.W.2d 797, 800 (Minn. 1997). A district court's findings of fact will not be set aside unless those findings are clearly erroneous. *Maurer v. Maurer*, 623 N.W.2d 604, 606 (Minn. 2001). We defer to the district court's credibility determinations. *Vangsness*, 607 N.W.2d at 472.

With certain exceptions, marital property includes all property acquired by either spouse during their marriage and before the valuation date. Minn. Stat. § 518.003, subd. 3b (2014). As a result, "[a]ll property acquired by either spouse during the marriage is presumptively marital, but a spouse may defeat the presumption by showing by a preponderance of the evidence that the property acquired is nonmarital." *Risk ex rel. Miller v. Stark*, 787 N.W.2d 690, 696 (Minn. App. 2010) (quotation omitted), *review denied* (Minn. Nov. 16, 2010). Under one exception to the general rule that property acquired during a marriage and before the valuation date is marital, property acquired during a

marriage and before the valuation date that is "acquired as . . . inheritance made by a third party to one but not to the other spouse" is nonmarital property. Minn. Stat. § 518.003, subd. 3b(a). Under another exception, property "acquired in exchange for" otherwise nonmarital property is also nonmarital property. *Id.*, subd. 3b(c).

To maintain its nonmarital character, nonmarital property must "either be kept separate from marital property or, if commingled with marital property, be readily traceable." *Olsen*, 562 N.W.2d at 800. "[T]racing property to its nonmarital sources does not require intricate detail." *Stark*, 787 N.W.2d at 697. Simply routing funds through a joint bank account "does not transform non-marital property into marital property." *Nash v. Nash*, 388 N.W.2d 777, 781 (Minn. App. 1986) (quotation omitted), *review denied* (Minn. Aug. 20, 1986). "Whether a nonmarital interest has been traced is . . . a question of fact." *Kerr v. Kerr*, 770 N.W.2d 567, 571 (Minn. App. 2009).

Neither party disputes on appeal that appellant inherited $35,379 in 2013 and that the funds that respondent withdrew from the parties' joint bank account included appellant's inherited funds. Property obtained from an inheritance is nonmarital property. Minn. Stat. § 518.003, subd. 3b(a). But appellant commingled his property with marital property in the joint bank account. *Olsen*, 562 N.W.2d at 800. In order to prove its nonmarital character, appellant must trace the property and show by a preponderance of the evidence that the property is nonmarital. *Stark*, 787 N.W.2d at 697.

On this record, we conclude that the district court's implicit finding that appellant failed to trace his nonmarital property is not clearly erroneous. *Kerr*, 770 N.W.2d at 569. This is not a simple case of routing funds through a joint bank account. *Nash*,

18

388 N.W.2d at 781. After respondent withdrew the funds, both marital and nonmarital property was transferred back to the joint bank account for the payment of expenses. Appellant's expert testified that there was "a fair account of activity, but I don't know the nature of how they segregated or designated funds to be spent." The record supports the district court's finding that appellant used funds from her account to pay marital expenses, including loans and utilities for the marital home, and the funds from her account included both appellant's nonmarital inheritance and other, marital, funds. Thus, the funds in the account from which the marital expenses were paid were commingled funds. And when funds are commingled, the burden is on the party claiming a nonmarital interest to trace that alleged nonmarital interest to specific property. *Crosby v. Crosby*, 587 N.W.2d 292, 296-97 (Minn. App. 1998) (finding that appellant failed to trace claimed nonmarital interests in a case in which funds were commingled and appellant only showed her funds were the "primary source" for acquiring certain assets), *review denied* (Minn. Feb. 18, 1999). On this record, however, appellant failed to identify any particular property acquired "in exchange for" the funds from his otherwise nonmarital inheritance. Therefore, appellant has not adequately traced his asserted nonmarital interests. *See Pettit v. Pettit*, 472 N.W.2d 668, 670 (Minn. App. 1991) (concluding that while the party had traced certain funds to a nonmarital inheritance, the party failed to trace those funds into any property acquired in exchange for the funds, and therefore that the district court had erred by granting that party a nonmarital interest in the parties' otherwise marital farm). As a result, appellant has not shown that the district court erred in treating the property acquired during the marriage as marital property and dividing it accordingly. *Olsen*, 562 N.W.2d at 800.

19

Citing *Stark*, appellant argues that the burden shifted to respondent to show how she spent the money once appellant traced the funds to the joint bank account on August 1, 2014. 787 N.W.2d at 690. We disagree. In *Stark*, the appellant withdrew $63,096.45—$52,636.59 of which was the respondent's nonmarital property—from a joint money-market account, without the consent of the respondent, shortly before the respondent commenced marriage-dissolution proceedings. *Id.* at 697-98. This court first reviewed the district court's decision regarding whether the respondent met her burden of showing by a preponderance of the evidence that the withdrawn money had a nonmarital source. *Id.* at 696-98. Having concluded that the record supported the district court's determination that the funds in question had a nonmarital source, the court then concluded that sufficient evidence supported the district court's finding that the appellant had disposed of those funds without respondent's consent. *Id.* at 698. *Stark*, however, does not suggest that the burden of proof shifts from a party alleging wrongful disposition of property to the other party once a nonmarital source for that property has been identified.

This case is distinguishable from *Stark* because appellant commingled his nonmarital property with the parties' marital property before respondent withdrew those funds, and respondent used those funds to pay the parties' marital expenses after that time. If appellant wished to preserve the nonmarital character of his inheritance, he could have kept it separate from the marital estate and traced it to the specific property existing when the district court dissolved the marriage. *Olsen*, 562 N.W.2d at 800.

Finally, we conclude that substantial evidence supports the district court's finding that respondent did not misuse marital property. Minn. Stat. § 518.58, subd. 1a. (2014),

20

provides that "[i]f the court finds that a party to a marriage, without consent of the other party, has . . . transferred, encumbered, concealed, or disposed of marital assets except in the usual course of business or for the necessities of life, the court shall compensate the other party." By the time of valuation, respondent's bank accounts did not contain $35,379; in other words, she did not retain the funds. The record shows that respondent handled the parties' finances throughout the marriage. The record also shows that she used the withdrawn marital property in the "usual course of business." Respondent testified that appellant expected respondent to "pay all of his bills and [hers]" after she moved out of the home. Respondent further testified that "[appellant] had been spending thousands of dollars on eBay and other places," and respondent was concerned that appellant would inappropriately use an excessive amount of the money. Respondent used money that had derived from the parties' joint bank account to pay the parties' mortgage, property taxes, home-equity loan, and other expenses. The personal account from which respondent paid expenses also included her paychecks. The district court found no credible evidence that respondent had inappropriately used the funds. We defer to this credibility determination. *Sefkow*, 427 N.W.2d at 210. Therefore, the district court did not abuse its discretion by finding that respondent had not misused the marital funds. *Olsen*, 562 N.W.2d at 800.

Because appellant failed to properly trace his nonmarital claim and evidence supports the finding that respondent did not misuse marital property, we conclude that the district court did not abuse its discretion by denying appellant's nonmarital claim and did not otherwise abuse its discretion when it divided these assets. *Id.*

21

**V.     The district court erred in awarding respondent the cryopreserved embryos.**

Appellant challenges the district court's award to respondent of the cryopreserved embryos. The district court's award to respondent of the embryos is based on its reading of the form titled "Consent Regarding IVF Services." That form was provided by the Mayo Clinic and is signed by both parties, as well as on behalf of the Mayo Clinic. It includes a check-the-box section addressing what the Mayo Clinic is to do with the cryopreserved embryos in certain circumstances, including "[d]ivorce/separation." For that circumstance, the column labeled "[c]ontinue to [s]tore for transfer to female partner" is checked. In the dissolution judgment, the district court noted that respondent wants the embryos "awarded to her pursuant to the consent [form] so that she may elect to have the embryos destroyed in light of the dissolution of the parties' marriage,"[3] while appellant "wants the embryos awarded to him, [to] continue to be stored indefinitely, and he is willing to pay for storage."[4] The district court ruled that the consent form "is a binding contract, enforceable by the court," and, apparently based on the form's reference to "transfer to female partner," ruled that "[t]he 2 remaining embryos shall be awarded to [respondent]." Appellant argues that the "plain language" of the consent form requires that the embryos be stored.

---

[3] We express no opinion regarding whether respondent's wish to "destroy[]" the embryos is consistent with the consent form's statement that the embryos are to be "store[d]" for "transfer to the female partner."

[4] We express no opinion regarding whether appellant's wish to store the embryos "indefinitely" is consistent with the consent form's statement that "[t]he maximum period" for storage "is 10 years."

22

When the terms of a contract are unambiguous, courts enforce the contract as written, absent an infirmity that would invalidate it. *Brookfield Trade Ctr., Inc. v. Cty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). "[W]hether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the [fact-finder]." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003). "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Id.* (quotation omitted). Here, we conclude that the consent form's use of "transfer" in its check-the-box section unambiguously refers to placing the embryos in the female partner in an attempt to produce a pregnancy. Thus, because the district court apparently based its award of the embryos to respondent on a reading of "transfer" to mean an assignment or conveyance of the embryos for purposes of changing their custodian or keeper, we conclude that the district court's disposition of the embryos is based on an incorrect reading of the consent form, and we remand the question of the disposition of the embryos to the district court.

**A. Construction of the consent form**

As noted, in the check-the-box section of the consent form, the column labeled "[c]ontinue to [s]tore for transfer to female partner" is checked for the circumstance of "[d]ivorce/separation." The form also states:

> In the majority of cases, more oocytes[5] are retrieved and fertilized than may be necessary to achieve a pregnancy. When this situation occurs, two options exist under the [Mayo Clinic Assisted Reproductive Technology] program for the handling of these extra fertilized oocytes.

---

[5] The consent form states that an "oocyte" is "a mature egg."

23

1.      Transfer the ideal number (presently thought to be 2 to 3) of the fertilized oocytes and discard the remainder;

2.      Transfer the ideal number of fertilized oocytes and store the remaining fertilized oocytes by the process called "cryopreservation."  Transfer of cryopreserved embryos after an unsuccessful embryo transfer of fresh embryos improves the overall chance for a successful pregnancy.

If at some time in the future a transfer is considered, the fertilized oocytes will be thawed and examined.  If it appears that they are viable, the transfer will be undertaken.

The use of "transfer" in the portion of the form quoted above, particularly in item 2 and the two sentences following it, unambiguously (a) *does not* refer to an assignment or conveyance of the embryos for purposes of changing their custodian or keeper; and (b) *does* refer to using the embryos in an attempt to produce a pregnancy.  *See Stedman's Medical Dictionary* 1622 (25th ed. 1990) (noting that "transfer" in the context of artificial insemination procedures refers to when, "after either in vitro or in vivo artificial insemination, the fertilized ovum is transferred . . . to the recipient's uterus.").

Consistent with this produce-a-pregnancy sense of "transfer," as well as the idea that the "ideal" number of fertilized oocytes to be transferred in an attempt to produce a pregnancy is two to three, a second part of the form identifies the "[n]umber [of fertilized oocytes] for fresh transfer" as "2-3."  A third portion of the form states that the "[t]ype of fresh transfer" that is to occur for the parties is a transfer at the "[c]leavage stage" of oocyte development.  And a fourth portion of the form notes that the Mayo Clinic "recommend[s]" a process identified as "Assisted Hatching" for "multiple prior failed embryo transfers." Each of these uses of "transfer" unambiguously refers to attempts to produce a pregnancy.

24

A fifth section of the form, however, states, "You have the option of transferring your embryos from Mayo Clinic. It is your responsibility to make the arrangements for any transfer." This fifth section of the form uses "transfer" in a sense other than the produce-a-pregnancy sense. Thus, while the form generally seems to use "transfer" in the produce-a-pregnancy sense, that sense of "transfer" does not appear to be the only sense in which that word is used in the form.

The crux of the parties' dispute regarding construction of the form is whether "transfer," as used in the check-the-box section of the form, refers to (a) an assignment or conveyance of the embryos for purposes of changing their custodian or keeper; or (b) using the embryos in an attempt to produce a pregnancy. Here, for three reasons, we conclude that the check-the-box section of the form unambiguously uses "transfer" in the produce-a-pregnancy sense. First, generally, unless context suggests otherwise, courts construing a contract assume that a word in a contract has the same meaning throughout the contract. *See, e.g.*, *Smitke v. Travelers Indem. Co.*, 264 Minn. 212, 214, 118 N.W.2d 217, 218 (1962) (construing "relative" to carry the same meaning throughout the entirety of the contract). And, as noted above, the majority of the uses of "transfer" in the form are in the produce-a-pregnancy sense of that term. Second, while the check-the-box section of the form allows storage for transfer to the female partner, it lacks any indication that cryopreserved embryos can (ever) be "transferred" to the male partner. The lack of an option to transfer the embryos to the male partner makes little sense if "transfer" merely refers to an assignment or conveyance of the embryos for purposes of changing their custodian or keeper. Third, the check-the-box section of the form does not allow selection of the store-

for-transfer-to-the-female-partner option at the end of what the form identifies as the 10-year maximum storage period for cryopreserved embryos, a prohibition making sense only if "transfer" is being used to refer to trying to produce a pregnancy. Thus, on this record, we conclude that the district court's reading of the form was incorrect, and that its disposition of the cryopreserved embryos based on that reading must be remanded.

### B. Other matters

Appellant makes several "alternative[]" arguments to challenge the district court's disposition of the embryos, including arguments questioning whether the disposition of embryos should be decided based on a contractual analysis. We need not address these arguments because, based on the plain language of the consent form, we are reversing the district court's reading of that form and remanding for the district court to readdress the disposition of the embryos. We note, however, that appellant's alternative arguments are consistent with questions raised by respondent in the district court, and that, while the district court used a contractual analysis for addressing the disposition of the embryos, it did not explain why it did so. As a result, it is unclear whether the district court's use of the contractual analysis is a considered choice, or simply an assumption that the contractual analysis is a proper vehicle for addressing disposition of the embryos.

A district court's failure to address why a particular result was reached (here, why a contractual analysis was used to address disposition of the embryos) can limit the reviewability of the district court's decision on the point. *See Suleski v. Rupe*, 855 N.W.2d 330, 338 (Minn. App. 2014) (remanding a parenting schedule because, while the schedule was clear, the district court failed to articulate its rationale for that schedule); *In re Salah*,

26

629 N.W.2d 99, 104 (Minn. App. 2001) (remanding a custody dispute because the district court "failed to adequately explain its application of [the relevant law]"); *see generally*, *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that for a question to be properly before an appellate court, that question must have been previously presented to and considered by the district court). Here, that limitation is exacerbated by the fact that the disposition of the parties' cryopreserved embryos is a question of first impression in Minnesota.

Thus, while we hold both that the district court's reading of the consent form runs afoul of that form's plain language[6] and that this misreading of the form requires a remand, we express no opinion on the propriety of using a contractual (or any other) analysis for addressing the disposition of the cryopreserved embryos. On remand, the district court shall not be limited to using a contractual analysis for addressing the disposition of the embryos, and shall explain why it selects whatever analysis it uses to address the disposition of the embryos.

Whether to reopen the record on remand shall be discretionary with the district court.

**Affirmed in part, reversed in part, and remanded.**

---

[6] We note that the Mayo Clinic, which is both the source of and a party to the consent agreement, is not a party to this litigation in which that agreement was construed.